UNITED STATES v. DURLAND.

(District Court, E. D. Pennsylvania. December 6, 1894.)

Nos. 19 and 20.

1. CRIMINAL LAW—USE OF MAILS TO DEFRAUD — SUFFICIENCY OF INDICTMENT.
    Indictments charging, in substance, either (1) that the defendant willfully devised a fraudulent scheme to obtain money from divers persons, and to cheat and defraud them thereof, by representing that the P. Co. (of which he was president) would, on the receipt of $10, and a further sum of $5 monthly for a time specified, from such persons, issue to each of them a bond in the terms set forth; that it was not intended to pay said persons the money mentioned in said bonds, but that the defendant intended fraudulently to apply the money so received to his own use; that it was intended to employ the United States mails to carry out the scheme by opening correspondence with such persons; and that the mails were so used; or (2) that the defendant devised a fraudulent scheme to obtain money by false pretenses, by representing to divers persons, and particularly to one B., that the P. Co. would pay large sums of money on the receipt of smaller ones, to wit, $100 on receipt of $60, etc.; that it was not intended to make such payments, but that the defendant fraudulently designed to convert the money to be received from such persons to his own use; that the defendant intended to use, and did use, the United States mails to carry said scheme into effect by opening correspondence, etc.,—sufficiently charge offenses under the statutes of the United States in respect to use of the mails to defraud. U. S. v. Flemming, 18 Fed. 907, followed.

2. SAME—EVIDENCE.
    Upon trial of an indictment charging the defendant with using the United States mails to promote a fraudulent scheme to obtain money by means of subscriptions to bonds purporting to return large profits upon small investments, evidence as to the defendant's knowledge and experi-

ence of financial schemes, and as to previous attacks made upon the honesty of the scheme, is material as bearing upon the question whether or not the defendant was himself deceived respecting it.

This was an indictment against John H. Durland for using the mails to promote a fraudulent scheme to obtain money.

Ellery P. Ingham and Harvey K. Hewitt, U. S. Attys.

Wm. C. Gross, James M. Beck, and Hampton L. Carson, for defendant.

BUTLER, District Judge (charging jury). The defendant is charged with devising a fraudulent scheme, and with using the mails to carry it into execution. If the charge is sustained by the evidence he must be convicted; otherwise he must not.

That the mails were used to carry out the defendant's scheme is undoubted.

Was the scheme fraudulent? It consisted substantially, as I understand the charge, of representing by letters, circulars and pamphlets that the subscribers to, or purchasers of, certain bonds issued by the company, of which the defendant was the projector, and is the president, will be paid according to their face, and that the holders will thereby derive great profit over the cost. Samples of the letters, circulars and pamphlets are before you, from which you must ascertain what the representations made are. The bonds, with other evidence relating to the subject, exhibit the financial part of the alleged scheme. From this evidence you must determine what the scheme really is, and whether the representations respecting it were true or fraudulent. While the details of the financial scheme under which the bonds were issued seem to be complicated, its main features are very simple. It will be seen, I think, on reading the bonds, that the only means proposed for their payment, consists of money to be collected from the bondholders, and comparatively a very small amount of interest that may be derived from investment of what is called the "Reserve Fund," which is taken from the money collected from bondholders. While I say this appears to be the only means,—this four-fifths of what the bondholders pay and the small earnings of the reserve fund, you must determine for yourselves whether it is so or not. You will see that the bond contains the contract between the company and the bondholder. It develops upon its face the entire financial scheme, and by it you will discover that the company does not make itself or its capital liable for the payment of the bonds. No matter what its capital is, the bondholders cannot get a dollar of it. It is referred to in the circulars, you will see, which recommend this company, and referred to presumably to show the advantages of investing in these bonds, and yet, according to the contract, the bondholders cannot touch the capital, cannot recover a dollar on account of it, because, I repeat, the terms of the bond confine the holders to a proportion simply of the money they pay, with the small accumulation of interest that may be obtained from an investment of what is called the "Reserve Fund." You thus see

that the company assumes no responsibility whatever, except to return to the bondholders, at the times and under the circumstances stated in the bonds, a part of the money that it receives from them. That is, as I understand, the scheme, as written in the bonds. You will examine the subject and decide for yourselves.

After ascertaining what the representations are or were and what the bond scheme was and the chances of profit to the bondholders generally were, you must decide whether the representations and the general scheme which this defendant concocted and carried out through the mails was fraudulent or not. Of course he is responsible for what others did under his direction. If a fraud was perpetrated by the use of the mails in the furtherance of this scheme, he is responsible for what he did by the hands of others as well as by his own. At the commencement of the business here the contract provided for a forfeiture of the money paid in by holders who failed to pay subsequent installments as they matured, and these forfeitures of course, while they tended to impoverish those who suffered the lapses, tended to improve the situation of the holders who continued to pay. This forfeiture was, however, measurably and principally, soon after stricken out.

So long as subscribers, in abundance, could be found for the bonds, who would pay their installments as they matured, the company, of course, could pay its bonds; and many of the holders might realize the large profits promised in the circulars and pamphlets referred to. The bonds, under the scheme having a chance of being called in and redeemed (and in this respect the scheme bears resemblance to a lottery) at specified times and rates in advance of maturity, the holders of those so redeemed might in some instances realize enormous profits, and these profits would be realized to the disadvantage of the other bondholders. And the large profits thus realized, when made public, would reinforce the effect of the representations referred to and render the bonds very popular with a certain class of people; and the business would seem to prosper enormously. And such was the experience of the company. But was it a legitimate, honest business? Or was it a delusive scheme, wild, and visionary, a mere bubble, that must necessarily explode when its true nature came to be understood? It seems clear to me (but this is for your consideration and determination) that the company's means of making payment depends entirely on existing subscribers continuing to pay their subscriptions, and its success in obtaining new subscribers who will also thus pay,—and principally upon the latter. The money obtained from one set of bondholders would serve to redeem the bonds of other subscribers then or previously redeemable. But as soon as the people who incline to invest in such schemes lose their faith, and the sale of bonds and the payment of installments consequently cease, the means of paying the bonds is at an end, as I understand the scheme. It is true the company would not be in default on its bonds, because the promise in them is to pay only out of the money received from the bondholders. But is the situation of the bondholders under such circumstances con-

sistent with the representations made in the circulars and pamphlets? You must consider and determine. As an illustration, take the situation of the bondholders in the New York company when it suspended. What had they to look to? Nothing whatever that I can see. They were admitted into the new company here because, probably, the interests of the new company required their admission. These bondholders had no legal right to come in, but if they had not been voluntarily admitted, the new company would possibly, if not probably, have failed at once, failed to get under way, because of the distrust which would necessarily have been created by the failure to pay these bonds, or admit the holders to a chance in the new company; especially in view of the fact that the new company was, in substance, simply the New York concern transferred to this city. As a further illustration take the situation to-day of the bondholders in the Philadelphia company. Suppose in consequence of the developments made in this case, or from other causes, existing subscribers cease payment, and new subscribers cannot be obtained, will the situation of the bondholders be consistent with the representations made through the circulars and pamphlets referred to. I trust I am not mistaken, and if I am I want to be corrected. According to the evidence, as I understand it, many millions of dollars of these bonds are now outstanding. What in such case will be the situation of the holders? Will there be anything for them? You must answer that question. Not a penny that I can see, beyond the inconsiderable amount (which would not be a drop in the bucket)—the inconsiderable amount in what is called the "Reserve Fund." What would $130,000 or $150,000 be to men who held bonds representing many millions of dollars? I think $15,000,000 is stated by one of the witnesses to be the amount outstanding. What source have they to look to?

I need not enlarge on the subject. You must determine whether the defendant has intentionally (because a man may delude himself, or may be deluded) devised a fraudulent scheme with a view to deceiving the public, and used the mails to promote it. In passing on the question you must consider all the evidence bearing on it, and consider it very carefully. If the defendant believed his representations to be true, believed in the justice and profitableness of his scheme, as represented in his circulars and pamphlets, he is not guilty of the crime charged, as I have already told you. In considering this you must carefully examine the financial scheme itself, and judge whether it is probable or not that any intelligent man who understands what it is, how it would work, could so believe; and, also, consider what the defendant has said upon the witness stand, who he is, and what his past life, character and experience have been.

It is further alleged by the prosecution that it was a part of this scheme that the president and managers, and their relatives and friends, should have an unfair advantage in the redemption of bonds, which advantage, it is said, could be obtained by reason of their having the management of the company and the administration of its rules. You must judge from the evidence whether such was a part

of the scheme, from the manner in which the scheme was worked, and, also, from what the witnesses speaking on the subject have said. Of course, if the defendant could not make anything out of his scheme, you would not believe he contemplated the perpetration of a fraud. One never commits fraud without a motive. He does it in the hope, the expectation of gain. Here the defendant makes his salary of $5,000. How much more he makes you must judge from the evidence. He deals in the bonds, as he has told you. Whether he and others connected with him obtain an undue advantage by such dealing you will judge.

If the evidence leaves your minds in doubt, you should acquit the defendant, as before stated. If, on the other hand, you are satisfied of his guilt, you should convict him. If he is shown by the evidence to be guilty, it is very important that he be convicted.

After a verdict of guilty, the defendant moved for a new trial and in arrest of judgment.

(January 15, 1895.)

BUTLER, District Judge. When called upon to plead the defendant moved to quash the indictments for reasons specified and filed.

The motion was overruled.

After verdict he moved for a new trial and in arrest of judgment, for reasons assigned, including those specified in the motion to quash.

These reasons, and others not specified at the time, are now urged with great earnestness in the defendant's behalf. I will not discuss the questions raised, at any length. They have, so far as material, been considered in the cases about to be cited.

Of the reasons specified for quashing, the first is wholly immaterial; and the second and third cannot be sustained. They are fully met by U. S. v. Flemming, [18 Fed. 907] Pagin, Fed. Prec. 255, note. That case was reviewed, and affirmed, and I adopt its conclusions respecting the matter here involved.

Of the reasons for new trial and arrest of judgment, I need do little more than say that I cannot sustain them. In considering the 1st, 3d, 4th, and 5th, it must be borne in mind that the business in New York, therein referred to, was identically the same as that transacted here; that it was, as the defendant testified, transferred here when driven away from there; and also to remember in this connection, and in considering the ninth specification, that a vital question in the case was whether the defendant was himself deceived respecting the scheme; that is, whether he believed it to be legitimate and honest, though in fact it was not. Under these circumstances it was deemed important to know what the defendant's knowledge and experience in this regard had been. For the same reason it was deemed proper to admit evidence that he had been attacked and the business denounced as dishonest, and his attention thus directed to its character. Of course his answer to the attack was also heard. In U. S. v. Stickle, 15 Fed. 798, where the defendant was on trial

(under the statute here involved,) and his intentions and the nature of his business were subjects of inquiry, the prosecution was permitted to prove a previous indictment and plea of guilty, for a like offense.

As respects the 2d specification, I need only say that it is inaccurate. The district attorney was not allowed to read from the attacks referred to; though doubtless some of his questions were based upon what he found in these attacks. The court forbade reading the attacks, or any part of them.

The 7th, 8th, and 11th do not seem to require comment. The 10th is directed against the latitude allowed in cross-examining the defendant. He came on the stand as a witness, and thus rendered himself liable to examination respecting his past conduct, so far as it might tend to shed light on his character and credibility. How far such examinations should go is matter for the discretion of the court. I do not think the discretion was abused in this instance.

A striking illustration of the extent to which such examinations are sometimes carried is found in Tilton v. Beecher (reported in a volume called "The Tilton & Beecher Trial"). The judge who sat was of distinguished character as a jurist, and the counsel engaged were among the most eminent of their time. All the material events of the parties' lives were brought out on cross-examination, several days being devoted to this object alone.

The 12th assignment is (unintentionally) misleading. The witness was under cross-examination and the question was deemed improper at the time. Whether he might have been examined on the subject if called by the defendant, would have depended on his qualifications as an expert. The counsel were informed by the court, (to avoid possible misunderstanding) that expert testimony respecting the scheme—its nature, feasibility, etc., was admissible, and would be received if offered.

The 6th, 13th, 14th, 15th and 17th specifications do not call for comment.

In addition to the reasons filed and above noticed, the defendant's counsel urge two others on which they seem to place most reliance: (1) That neither bill charges an offense under the statute; (2) if it does, more than three offenses (the statutory limit) are embraced.

The second is purely technical, and if correct in point of fact, cannot be allowed after verdict. If true the defendant has suffered no injury from this cause. If embarrassed in preparing his defense he should have called attention to it at that time, when the government could have cured the defect, if one existed without losing its right to punish the defendant if found guilty—as it must do if the reason is now allowed and judgment arrested. U. S. v. Nye, 4 Fed. 888; Pickering v. Telegraph Co., 47 Mo. 461; House v. Lowell, 45 Mo. 381; Com. v. Tuck, 20 Pick. 356; Forrest v. State, 13 Lea, 103; 1 Bish. Crim. Proc. § 442; Rev. St. § 1025.

As respects the first of the additional reasons it must be conceded, I think, that the defendant should not be sentenced if it is true.

Indictment No. 19 charges, in substance, that the defendant at

the time named, willfully devised a fraudulent scheme to obtain money from divers persons unknown to the grand jury, to wit, sums of $50 from each of said persons, and to cheat and defraud them thereof, by representing that the Provident Bond & Investment Company (of which he was president) would on the receipt of $10, and a further sum of $5 monthly for a time specified, from said persons, issue to each of them a bond in the terms set forth; that it was not intended to pay the said persons the money mentioned in said bonds and so promised to be paid, but that the defendant intended fraudulently to apply the money so received to his own use, and not towards the discharge of the said bonds as therein stated; that it was intended to employ the United States mails to carry out this scheme, by placing letters therein and opening correspondence with such persons, and that the mails were so used and correspondence opened.

No. 20, in substance charges that the defendant devised a fraudulent scheme to obtain money by false pretenses, in the manner and by the means described, which consisted substantially in representing to divers persons unknown, and particularly to one W. S. Burke, that the Provident Bond & Investment Company would pay in the manner and at the times stated, large sums of money on the receipt of smaller ones—to wit $100 on the receipt of $60, and $1,000 on the receipt of $500; that it was not intended to make such payments, or that they should be made, but that the defendant fraudulently designed to convert the money so to be received from such persons to his own use, and not to make payment to them as represented and promised; that the said defendant intended to use and did use the United States mails to carry said fraudulent scheme into effect by opening correspondence, etc.

Each of these indictments, in my judgment, charges an offense under the statute. The acts described seem, plainly, to be embraced by its terms. The indictments are possibly not drawn with so much care and skill as might have been employed. The only question here presented, however, is do they charge offenses? In my judgment they do. The argument to the contrary is I think fully met by U. S. v. Flemming, before cited. Indeed that case seems to meet every material question raised by this. What is there said respecting the refined criticism urged against the indictment under consideration, applies with equal force here. Time was when such criticism was effective but it has passed. Indeed it never was effective in the federal courts. They have always held that it is sufficient to charge an offense with such particularity as will protect the accused against danger of a second conviction and enable him to prepare for trial. Here, as we have seen an offense is charged, and it cannot be pretended that the defendant is in danger of a second conviction. The government has seen fit to include all use made of the mails, in furtherance of the scheme, in these bills. The language clearly precludes any further charge on that account. If such inclusion was erroneous, or the bill was so wanting in particularity as to embarrass the defendant's preparation for trial, he should, as before stated,

have taken advantage of these defects at an earlier stage of the case. While the defendant's construction of the statute is ingenious it seems to me to be clearly erroneous. It ignores the obvious signification of the terms used. The argument is so fully and satisfactorily met by the opinion of the court in U. S. v. Flemming that I could not profitably add anything to what is there said. The facts of that case were similar to those before me. The judge (Blodgett) who decided it below is greatly distinguished for learning and ability, and his decision as before remarked was affirmed on review. If it is in conflict with In re Henry, 123 U. S. 372 [8 Sup. Ct. 142], in one respect, as the defendant urges, it is not as relates to the matter here under consideration. See, also, U. S. v. Watson, 35 Fed. 359; U. S. v. Wootten, 29 Fed. 702; U. S. v. Jones, 10 Fed. 469; U. S. v. Stickle, 15 Fed. 798; U. S. v. Haeflinger, 33 Fed. 469; U. S. v. Haynes, 29 Fed. 691; In re Jackson, 96 U. S. 727.

I am not able to see any materiality in the fact that the Provident Bond & Investment Company had a charter, and that the defendant was its president. As he testifies, he "invented the scheme," obtained the charter and formed the company. If the scheme was a fraud, as charged, and found by the jury, how could the charter authorize the use of the mails for its promotion, against the prohibition of the statute? As well might it be urged that a charter authorizes the use of the mails to promote a lottery. Indeed it was so urged in Re Jackson above cited, but the charter was held to be unimportant. The charter here relied upon is not, however, a charter of this scheme. It is couched in vague, general terms, and appears to have little if any relation to the business transacted by the company. Under similar charters issued by New Jersey, West Virginia, and some other states, most of the dishonest financial schemes designed to cheat ignorant and credulous men and women, are carried on. The charters are obtained for a double purpose, first to secure, or in the hope of securing, personal immunity to the dishonest schemers, and secondly to secure a greater degree of confidence in their schemes. The circuit court of this district has very recently had occasion to pass upon the character of business transacted under one of these charters, issued by West Virginia to the Mutual Bond & Investment Company and found it to be a gross fraud upon the public. McLaughlin v. Investment Co. (April Sess. 1894) 64 Fed. 908. The charter there was as vague and general in its terms as the one before me, and had about as little relation to the business transacted under it.