THE FIDELITY FUNDING COMPANY, C. ROMANDER AND J. W.

LENEVE, v. T. A. VAUGHN.

(Filed February 13, 1907.)

1. **LOTTERY CONTRACT.** Where a contract contains a prize feature and is dependent upon chance, the chance feature being the writing of new contracts and lapsation, both of which are contingencies over which the parties have no control and which they can not foretell, such contract is in effect a lottery.

2. **FRAUDULENT CONTRACT.** Where a contract promises to each investor that which cannot be performed, and takes the money of one investor to pay another, with no provision for the ultimate payment of those whose money is thus taken, and promises large profits from the business, which are not earned nor expected to be earned in the business, and there is no property or capital for such payment, and where absolute promises of payment are made, and the ability to perform them depends upon contingencies which the company can neither perform or foretell, and the ability to perform which depends upon the broken promises of some of the investors for the means to pay others, and the extent of this is a contingency known to be beyond the control or forecast of the company: Held: That such contract is fraudulent upon its face.

3. **AGENT OF LOTTERY COMPANY—His Liability.** Where an agent for a lottery company, acting under a contract which is fraudulent upon its face, is the active manager of the branch office of the company, and wrongfully induces a person to invest in such lottery and issues to such person certificates containing such fraudulent contract, such person having no knowledge that the business of the company is that of a lottery, and is persuaded by the agent to invest by inducements held out that it is a profitable investment, and that the business is legitimate and profitable, such agent knowing at the time that the business is a lottery and has been so held by the postal authorities of the United States: Held: That the agent is liable equally with the principal in any action which the party making such investment may maintain against his principal to recover the money paid by him to such agent for certificates in such lottery.

4. **GARNISHMENT—Owner of Funds.** Where the agent of a lottery company receives a check or draft from the company, the proceeds of which it is intended shall ultimately be applied to the payment of one of the certificate-holders of the company, but which check or draft is deposited in the bank in the name of and to the credit of the agent, the certificate-holder to whom the money was ultimately intended to be paid is not the owner of such money and has no more claim upon the same or interest therein than any other certificate-holder connected with the company, and such money so placed on deposit, remains the money of the company and subject to garnishment by one holding a claim against the company.

(Syllabus by the Court.)

*Error from the Probate Court of Oklahoma County; before*
*Wm. P. Harper, Trial Judge.*

*W. A. Smith,* for plaintiff in error.

*Crockett & Johnson,* for defendant in error.

### STATEMENT OF FACTS.

The defendant in error T. A. Vaughn, commenced this action in the probate court of Oklahoma county against the plaintiffs in error, the Fidelity Funding Company and C. Romander, to recover the sum of $685.50. Garnishment proceedings were issued against the Oklahoma City National Bank, and it answered, claiming to have $1109.18 in its possession belonging to the defendant, C. Romander. Plaintiff in error, J. W. Leneve, intervened, claiming the money in the hands of the bank as belonging to him.

The Fidelity Funding Company was incorporated under the laws of California, succeeding the Empire Diamond Company of the same state. C. Romander was the agent of the Fidelity Funding Company for Oklahoma Territory, and established his office in Oklahoma City in May, 1904.

The business of the corporation consisted in selling what was called reserved secured interest-bearing certificates, which, after many conditions, purported to pay to the party accepting one of the contracts, one and 50-100 dollars for every dollar he paid into the company.

In June, 1904, the defendant in error, Vaughn, through Romander, was solicited to, and purchased five of the certificates, and later, in November, purchased twenty additional. Altogether, at various times, Vaughn paid into the company for these certificates, $685.   Payment, as provided by the terms of these certificates, was to be made to the company in installments of one dollar each consecutive calendar week until the certificates should be matured, and by the provisions of the certificates it was agreed that the purchaser should be paid at maturity and when the funds applicable thereto are sufficient, one and 50-100 dollars in gold coin for each of the weekly installments paid according to the terms, conditions, limitations and provisions contained in the contracts.

The petition of the plaintiff below, among other things, alleged that he was induced by Romander to purchase these certificates; that the certificates had no value; that the defendants appropriated the money to their own use; that the contracts were illegal and that the defendant wrongfully conspired to cheat and defraud the plaintiff out of his money: that the said defendants did not set aside the money to redeem the contract as the certificates provided, but appropriated the money to their own use; that the plaintiff entered into the contract in good faith and did not know that they were illegal, and prayed for judgment for $685.50, together with interest at the rate of seven per cent. and for $100.00 attorney fee.

Various motions and demurrers were made and passed upon by the court. A copy of one of the certificates was attached to the petition, and reads as follows:

"IN CONSIDERATION of the application upon which this RESERVE SECURED INTEREST BEARING CERTIFICATE is issued which application is made a part thereof, and the payment to this company of $1.00 for each consecutive calendar week until this certificate shall be redeemed, canceled and paid, will at the maturity hereof and when the funds applicable thereto shall be sufficient as herein provided, pay to T. A. Vaughn of Oklahoma City, his heirs, executors, administrators or assigns $1.50 gold coin of the United States for each such weekly installment, according to and under the terms, conditions. limitations, and privileges herein and on the back of this instrument contained, to which special reference is hereby made and which with the said application upon which this certificate is issued, are hereby incorporated in and form a part of this agreement was fully and completely as if recited at length upon the face hereto and over the signature hereto affixed.

"Provided, however, that not more than 100 weekly installments will be received hereon by the company and when said number of installments shall have been paid by the holder, this certificate shall be deemed fully paid up and to have arrived at the final maturity period thereof, and shall be entitled to redemption and payment by the company in the time, manner, form and from the funds as herein provided.

"This certificate is issued to the applicant therefor in consideration of his specific agreement to pay to this company at its office in Houston, Texas, unless otherwise directed, a weekly installment of one dollar, ($1.00) on or before the last day of each calendar week, commencing with the week in which this certificate is dated until this certificate shall be redeemed and canceled, for not exceeding one hundred (100) calendar weeks.

"This agreement to make said weekly payments is to be strictly construed, and time is of the very essence thereof, under penalty of forfeiture of all installments and payments theretofore made by said applicant, or holder, who hereby waives all notice, and in event of such failure to pay, of all rights or claims under this certificate. Provided, however, in case of any such failure to pay any installment within the week when payable, the said applicant or holder hereof may have one week's grace within which to make said payment, by adding to said payment and paying with it 25 cents additional therefor as a grace fee, but if any said installment, together with said grace fee, shall not be paid on or before the last day of such next succeeding calendar week, then all the rights of the applicant or holder of said certificate herein and in and to all payments theretofore paid are hereby waived, made null and void, and absolutely forfeited.

"This certificate is transferable, but no transfer will be recognized by the company, unless first registered at the company's office in Houston, Texas, for which a registration fee of two ($2.00) dollars will be charged.

In witness Whereof, The Fidelity Funding Company has caused this certificate to be executed and delivered this ———day of June, 1904.

"W. L. Pierce,
"President.
"F. C. Hedges,
"Secretary.
"This certificate must be countersigned by
"J. H. Smith,
"Superintendent Dep't S. W.

"conditions.

"First: The company shall employ 80 cents of each weekly installment of $1.00 after the tenth weekly payment on this and all future Reserve-Secured Interest Bearing Cer-

2—Vol 18

tificates together with all grace and transfer fees, in providing for the payment and redemption of this and all other contracts or certificates heretofore issued or contracted to be issued, or to be issued by this company or by the Empire Diamond Company, of which this company is its successor, as herein provided, and may retain all other sums paid thereon, including the remaining 20 cents out of each weekly installment for its own use and benefit. By 'Contracts', whenever such term is used herein, is meant the contracts of said predecessor of this company, and by 'certificates' is meant the Reserve-Secured Interest-Bearing Certificates of the Fidelity Funding Company.

"Said contracts or certificates are in and of one general consecutive series and payable in the order in each provided.

"Second: Said sums so to be employed for redemption shall be assigned to three several funds, to wit: 60 per cent thereof and one-half of each transfer fee and all grace fees received to the redemption fund.

"The company hereby donates the ninth and tenth weekly installments paid on each certificate, and this, together with one-half of each transfer fee, shall constitute an interest sinking fund. The balance, or 40 per cent, to the reserve fund.

"Third: The redemption fund shall be used for maturing and paying contracts, or certificates, in the order of their issuance as in each, the contracts or the certificates provided. As often as there is paid to the company enough of said weekly installments so that the proportion thereof together with all other sums assigned to the redemption fund for that purpose shall equal the redemption value of any oldest outstanding paid-up contract in force issued or contracted to be issued by the predecessor of this company, said contracts shall be come due and entitled to performance as therein provided,

and after the performance of all of said contracts, as often as there is accumulated in said redemption fund, for that purpose, sufficient to pay the oldest outstanding paid-up weekly series of Reserve-Secured Interest-Bearing Certificates in force, all certificates belonging to said weekly series shall be redeemed and paid, and it is specially provided that no certificate shall be deemed matured or entitled to payment until there is sufficient in the redemption fund for that purpose, or as added by the reserve and interest sinking fund as herein provided, to redeem and pay all paid-up certificates in the weekly series to which it belongs. The interest sinking fund and the reserve fund may be invested by the company, its successors and assigns, according to the judgment and discretion of its board of directors or the managing officers of it, or of its successors and assigns, in such manner as is stated in the articles of incorporation of this company, and the principal, interest and earnings thereof used as herein provided for the payment and redemption of the said Reserve-Secured Interest-Bearing Certificates.

"Fourth: To this certificate and to each one hereafter issued, shall be credited its proportionate share of the said reserve fund and its interest, profits and accumulations, and such share of the reserve fund, its interest, profits and accumulations shall not be used for any other purpose, saving and excepting the expenses incident to the handling, investing and preserving of said reserve fund, than the redemption of the particular certificate to which said proportion of said reserve fund is credited as herein provided, until such certificate shall be redeemed or canceled, when such part as may be unused for the redemption of the certificate to which it shall have been accredited, shall belong to the general reserve fund for the benefit of all uncanceled certificates.

"Fifth: If at any time there shall not be in the redemption fund sufficient to pay and mature in the order of weekly series herein provided all Reserve-Secured Interest-Bearing

Certificates in force and upon which all weekly installments to and including the one hundredth, shall have been paid, the company may use so much of the interest, earnings and profits of said reserve fund as with the amount in the redemption fund shall be required to redeem and pay the oldest weekly series in force, and thus continuously by consecutive weekly series until all paid-up series are redeemed and canceled, and in case the said redemption fund and the interest, earnings and profits of the reserve fund shall at any time be insufficient to pay and redeem all paid-up weekly series as aforesaid, all certificates in such unredeemed series shall bear interest at the rate of 4 per cent per annum, payable semi-annually and payable exclusively from the interest sinking fund and if necessary to the full extent thereof, upon the full amount of the 100 weekly installments paid thereon until there shall be sufficient accumulated from the interest earnings and profits of the reserve fund and in the redemption fund to pay and cancel the series to which they belong, at which time they shall be paid, provided, however, that the company shall not be required to withdraw money from any of its then existing investments for any purpose unless in the judgment of its board of directors it can be done without injury, damage or disadvantage to such investments.

"Sixth: All Reserve-Secured Interest-Bearing Certificates shall be issued and numbered in consecutive weekly series, each weekly series to comprise only certificates for which applications shall have been made during the same calendar week for which the certificates are issued, irrespective of the time when said application may be revived or be presented at the office of the company, and said certificates, or so many of them as shall be in force, shall be redeemed, and canceled, by weekly series in the same consecutive order in which they were issued, and it is expressly provided that no certificates, except as herein provided, shall be entitled to payment until the weekly series in which it is written is the

oldest outstanding paid-up series, and there is in the funds of the company applicable thereto sufficient to pay and redeem all certificates in said weekly series.

"It is also provided that neither the company nor its officers nor members are liable upon this certificate or instrument except for the faithful application of the funds paid hereon as herein provided.

"Seventh: The company reserves the right when not less than 26 weekly installments have been paid upon the oldest outstanding weekly certificates of this grade, all prior series thereof having been canceled and paid; to call in and redeem any such oldest outstanding series prior to final maturity period, by payment to the holders thereof of the amount shown in the table of redemption values published herewith.

"Eight: The company may, by resolution of its board of directors and when it deems it may do so without detriment or disadvantage to its then present investments, release and use from the principal of the reserve fund, such sums as it may deem best for the more rapid maturity and redemption of its certificates by regular consecutive weekly series as before provided, but for no other purposes. The amount which may be so released and used not to exceed, however, the proportionate amount accredited to the certificates for the maturity of which it is to be used.

"SPECIAL PRIVILEGE FOR THIS CERTIFICATE.

"Ninth: It is specially provided that until the maturity period of the oldest weekly series of certificates of this grade shall merge and coincide with the maturity period of the oldest weekly series of certificates of grade 2, being the Pacific Coast grade, one-half of the redemption fund accruing from the payment of installments on this and all certificates of this grade shall be assigned, distributed, apportioned ap-

propriated and applied exclusively to the redemption of this and all other certificates of this grade in consecutive weekly series in the order hereinbefore provided.

"Tenth: The company, its officers, successors and assigns is hereby constituted and appointed the agent and attorney in fact of the owner and holder of this certificate to apportion, manage, control, distribute, handle, invest and pay out all the moneys paid herein by such owner or holder, and all other owners and holders of certificates in the manner provided herein, and for all the purposes of conducting the business as in the judgment of its board of directors may seem wisest, or as said company, its successors and assigns may hereafter determine. The intent hereof being that the company shall use its best efforts within the limitations as to the amount herein provided, to make the best profit for its investors it shall lawfully be enabled to do, and it shall make such change or changes in its business and in this certificate and agreement, and in the terms and conditions thereof as may be deemed for the best interests of the certificate holders and the said company, or to comply with the laws of any state, territory or municipality or of the United States, or in any other particular, in good faith for the benefit of its investors or the perpetuity of the business, hereby approving and confirming all the said company may honestly do in the premises; Provided, however, that nothing herein contained shall increase the amount or hasten the time of payment of the weekly installments nor the total amount thereof upon this certificate. The power hereby granted is irrevocable and is coupled with an interest in the subject matter thereof, and in said moneys and business which is owned and held by said company.

"Eleventh: This certificate is issued at the request of the applicant therefor in writing made and executed which application and all therein contained is made a part of this agreement and is incorporated herein as though here specially

recited, and this certificate, to-wit: Consisting of the face thereof and of all upon the back thereof contained and the said application therefor, constitutes the entire contract and agreement between the holder of this certificate and the company, and no agent or officer thereof unless duly authorized by the board of directors of said company is empowered to make any change or variation therein."

Opinion of the court by

PANCOAST, J.: The principal, if not the only, contention in the court below in this case was that the contract or certificate issued to the defendant in error was in itself illegal and void, because it was a lottery and a fraud. It was contended that the lottery features consisted of: First, the prize feature of the contract: Second, the certainty in value of return being dependent upon chance, the chance features being the writing of new contracts, and lapsation, both of which are contingencies over which the parties had no control and which they could not forecast, the fraud features of the contract being that the business of the company would not finance out.

It might be well, before discussing the legal features in this controversy, to pause for a moment and state that the government has issued a fraud order against this company and that all of its business subsequent thereto has been conducted through the express companies instead of the mail.

Some twelve different assignments of error are argued in the brief of the plaintiffs in error, but, owing to the conclusions we have reached, only three are of importance. All the remaining assignments are subordinate to and depend upon the others.

It seems strange that, in the light of the numerous decisions of the various courts bearing upon this class of contracts, any company organized for the transaction of such business as is provided in the certificates of this company, would undertake to persuade a court of justice that the contract under consideration was not a lottery. Without going into the contract in detail, it is sufficient to say it partakes in all its essential features of the numerous contracts that have been before the several courts and have been universally held to be lotteries, embracing the elements of procuring through lot or chance, by the investment of a sum of money, some greater amount of money. The contract is also fraudulent upon its face, for it promises to each investor what cannot be performed. It takes the money of one investor to pay another, with no provision for the ultimate repayment of those whose money is thus taken. It promises to pay large profits from the business which are not earned nor expected to be earned in the business and with no capital or property for such payment. It makes absolute promises of payment when their performance and the liability to perform them depend upon contingencies which the company can neither perform or foretell. It depends upon the broken promises of some investors for the means to pay others, and the extent of this is a contingency known to be beyond the control or forecast of the company.

The ability to pay the older investors depends entirely upon the amount of new business solicited and the fact that it will require more than one new share solicited to pay one old share, the new business solicited must constantly increase at a high progressive rate in order to make such payments,

and, it being impossible to continue this indefinitely, the end must come sooner or later, and when it does come, the more successful the business up to that time, the greater and more wide-spread will be the loss.

In other words, when a member drops out, his money goes to those who remain. The first class feed upon the second, the second upon the third, and so on until the collapse. In the language as stated in *Public Clearing House v. Coyne,* 121 Fed. Rep. 929, "It is a literal demonstration of the old saying, 'The devil take the hindmost.'" Indeed, it has not the elements of fairness of the old-style lottery, for in such case it was fairly understood by the investor that there was an element of chance, and, while there was some chance of getting something for nothing, it was also understood that there must be some blanks; while in the case of this company it is represented that the investor will receive fifty per centum profit on his investment and that there will be no blanks drawn. Yet the vice of the plan is that many must fail in order that all the continuing certificates shall mature, the inducement being that those who may be strong enough to survive will find their profit in the weakness, misfortunes and discouragements which cause a large number of their associates to fall by the wayside.

As bearing upon the different features of this question, the following cases are cited: *State ex rel. Prout, Atty. Gen. v. Nebraska Home Co.,* 92 N. W. 765; *W. U. v. McDonald,* 59 Fed. Rep. 563; *Horner v. The U. S.,* 147 U. S. 462; *McLaughlin v. National Mutual Bond and Investment Company,* 64 Fed. Rep. 911; *Peltz v. Supreme Chamber O. of F. U.* (N. J. Eq.) 19 Atl. 668; *State v. New Orleans Debenture*

*Redemption Company,* 51 La. Ann. 1827, 26 So. 586; *S. C. & G. R. R. Co· v. A. S: R. Co.* 33 S. E. 36; *State v. Interstate Co.,* 52 L. R. A. 530; *In Re National Indemnily & E. Co.,* 21 Atl. 879; *U. S. v. Durland* 65 Fed. 408; *Randall v. State,* 42 Tex. 585; *People v. Elliott,* 74 Mich. 264; *McLanahan v. Mott,* 73 Hun. 131.

The next question of importance is as to whether or not the court erred in rendering judgment against the defendant, C. Romander. Romander was the active agent of the company and solicited the purchase of the certificates which are the basis of this action. He personally induced the defendant in error to enter into the illegal contract. He was the one who perpetrated the fraud in this particular instance. In cases of this kind, both principal and agent are wrongdoers. No matter how small or great the wrong or advantage, there will be no justification for its commission. *Weber v. Weber,* 42 Mich. 569. The agency in such cases is no protection, nor is the fact that some one else received the benefit of his wrongful act. It is immaterial that the authority was delegated to some one else. It is immaterial whether one who commits the wrongful act acts for himself or for another, he is none of the less a wrong-doer. *Johnson v. Barber,* 51 Am. Dec. 416; Reinhard on Agency, section 314; *Campbell v. Hillman,* 15 B. Mon. 508; Am. and Eng. Ency. of Law, vol. 1, p. 1135.

The only remaining proposition which it is necessary to notice as is to the intervener, Leneve. He was allowed to intervene in this case, setting up the fact that he was the owner of the money garnisheed. The facts, as disclosed by the record, are that the defendant, Romander, had received

a check or draft from the company with which it was intended to pay a claim belonging, as shown by the books or records of the company, to F. S. Slagle, for $962., but in which it is alleged that Slagle had no interest and that Leneve was the owner thereof. The amount of money sent to the agent, Romander, was $1443., $962 of which it is claimed was to pay the claim of Leneve, and the remainder to pay another claim. This draft was deposited in the Oklahoma City National Bank to the credit of Romander and was in that condition when the garnishee process was issued and served. It seems evident that this money, no matter from what source it had been derived, was the money of the company which the company sent to its agent, and which its agent still retained by depositing it in his own name in the bank. . It had, therefore, not been segregated in any way, but was still under the control of the company or its agent, subject to the check of Romander. It was not in such a condition that any principle of trust could attach thereto. Until the amount had been paid out by Romander or some other agent of the company to Leneve, Leneve could have had no more interest in this particular money than in any other fund belonging to the company. No matter what might have been the intention of the company for the payment of the certificates which it is claimed by Leneve belonged to him, he was in exactly the same position of the other certificate-holders, in that they each held the company's promise to pay, and until the payment was actually made, the money, no matter from what source it was derived, belonged to the company. The court below, therefore, very properly sustained the demurrer to Leneve's evidence, as from his own evidence he was not the owner of the money garnisheed.

No error appearing in the record, the judgment of the court below, will be affirmed.

Burford, C. J., Burwell, J., and Garber, J., dissenting; all the other Justices concurring.