# CASES ARGUED AND DETERMINED

## IN THE

# SUPREME COURT OF MISSISSIPPI

### AT THE

## OCTOBER TERM, 1911.

---

JACKSON LOAN & TRUST CO. *v.* STATE EX REL. HUDSON, ATTORNEY-GENERAL.

[56 South. 293.]

1. CORPORATIONS. *Forfeiture of franchises. Appointment of receiver.*

Where a loan company by means of attractively worded literature and by representations of its soliciting agents, seeks to induce the public generally, and prospective customers particularly, to believe that all purchasers of its contracts will receive loans from the company upon easy terms with which to purchase homes, and the funds of the corporation and its method of business, render it impossible for the company to make loans to all purchasers of its contracts, its promises so to do, evidences an intention to defraud, and its whole course of business constitutes such a systematic violation and abuse of the rights and privileges conferred upon it by its charter as to justify either the revocation of its charter or the issuance of a writ of injunction enjoining the further prosecution of such business.

(440)

2. APPOINTMENT OF RECEIVER.   *Right to appoint.   Code* 1906, *Sec.* 4029.

> In the absence of a statute so providing, the chancery court in a
> proceeding to restrain a corporation from continuing in the
> business of selling and disposing of loan and investment con-
> tracts and asking for the appointment of a receiver, is without
> power to appoint a receiver or trustee to wind up the affairs of
> such corporation.   Sec. 4029, Code 1906, only providing for the
> appointment of such trustee after judgment of forfeiture and
> ouster.

APPEAL from the chancery court of Hinds county.
HON. G. G. LYELL, Chancellor.

Suit by the state on the relation of S. S. Hudson, at-
torney-general, against the Jackson Loan & Trust Com-
pany.   From a judgment enjoining defendant from fur-
ther prosecuting its business and appointing a receiver,
defendant appeals.

This was a suit filed by the attorney-general, in the
name of the state of Mississippi, against the Jackson
Loan & Trust Company, a corporation chartered under
the laws of the state, in which it is sought to restrain
this company from continuing in the business of selling
and disposing of loan and investment contracts, and ask-
ing the appointment of a receiver to take over the assets
of the company to be distributed among parties having
claims against the company arising out of said con-
tracts.   The defendant answered, and then filed a motion
asking the court to dissolve the temporary injunction
previously issued.   The state then filed a motion asking
for the appointment of a receiver.   By agreement the
two motions were heard together before the chancellor,
who took proof, and decreed that "the defendant, though
not insolvent, violates the law and public policy of the
state, as well as its charter franchises, orders, adjudges,
and decrees that the motion of the defendant to dissolve
the injunction be, and the same is hereby overruled, and
the motion of the state for the appointment of a receiver
be and the same is hereby sustained."   From this de-
cree an appeal was granted with *supersedeas.*

There were two questions presented on the hearing in the supreme court: (1) Was the chancellor justified in overruling the defendant's motion to dissolve the injunction? (2) Was the chancellor justified in sustaining the state's motion for the appointment of a receiver? The state's contention is that the business conducted by the defendant is a fraud. The defendant contends that the chancery court is without jurisdiction, and that this is a matter of contract between the parties, and should be privately adjusted between them.

The contract issued by the appellant is as follows:

"No.——. Series——. The Jackson Loan & Trust Company. Authorized Capital, one hundred thousand dollars. Investment Home Purchasing Contract. In consideration of the application for this contract and the advance payment of one dollar, and the payment of a monthly installment of one dollar to be made on the fifteenth day of each month from date hereof, the Jackson Loan & Trust Company issues this contract to—— or to his legal heirs, or assigns, upon the following conditions and terms and subject to the benefits, provisions, and requirements printed on the back hereof, which are hereby referred to and made a part of this contract as fully as if recited herein. Terms and Conditions. It is hereby agreed, that the monthly installments having been paid as herein provided, for three consecutive months, shall render this contract eligible for a loan, or funds to purchase a home in the sum of ($100) one hundred dollars in the order of the holder's application therefor, the applicant being then entitled at his election, to advance the nine dollars required to make up the amount of twelve dollars provided for in paragraph No. 17, of said requirements as a condition to a loan. Eighty cents from each and every monthly installment received hereon, after the third installment, and all transfer fee, accrued interest, and return payments from all loans made from the loan funds, shall be placed in the loan

fund for the purchase of homes, or for making loans to the holders of contracts issued by the company. When this contract is entitled to a loan or for funds for the purchase of a home, the holder hereof of this contract shall obtain a complete abstract of the title to the property to be purchased, or on which a loan is desired, to be examined by the attorneys of the company, and if the title be approved and the property purchased or a loan made on same, the holder of this contract shall execute a deed of trust or mortgage, or a contract giving the company a lien on said property or land in such way or kind as the attorneys of the company may determine to be necessary. And the company shall pay, for the benefit of the holder of this contract, the said sum of one hundred dollars as aforesaid; and the holder of this contract shall pay to the company the sum of one dollar and twenty-five cents per month when a home is purchased, or a loan is made, on or before the fifteenth day of each calendar month, including interest at the rate of five per centum per annum. The said sum of one dollar and twenty-five cents per month including five per centum interest per annum, shall be placed to the credit of the holder of this contract, and shall be used to pay off the indebtedness of the holder of this contract to the company. When the monthly payments of one dollar and twenty-five cents shall aggregate the sum of one hundred dollars with interest and costs, less the amount the holder of this contract has paid this company, with interest on same at the rate of three per centum per annum after his third installment of monthly dues and before a home is purchased or a loan is made, then the lien of the company shall be discharged, and the title vested in the holder of this contract. It is further agreed that the remaining portion of the dues after the third monthly installment, except that portion set aside for the loan fund, shall be used for the expense of the company, or as may be deemed best by the board

of directors.  Issued at the principal office of this com-
pany, at Jackson, Mississippi, the ——day of——, 19—.
[Signed] ——, President.  [Signed] ——, Secre-
tary.  [Seal.]

"Benefits, Provisions, and Requirements. . . . (5)
If the holder of this contract shall have other contracts
of this kind with the company, and his home shall cost
more than one hundred dollars, and only a fractional
part of the sum herein provided for shall be required
to pay for said home, then such fractional part of one
hundred dollars shall be furnished by the company, and
the holder of this contract shall pay for such sum ob-
tained on this contract the sum of one dollar and twenty-
five cents on each one hundred dollars advanced, on or
before the fifteenth day of each month subject to all
other conditions contained in this contract. . . . (7)
After (eighty) monthly installments of one dollar shall
have been paid thereon, this contract shall be deemed
matured and no further payments shall be required, and
the company promises and agrees to pay to the holder
hereof, or his legal heirs or assigns, the total amount
of not over one hundred dollars, which shall be deemed
the maturity value of this contract, provided all ex-
penses and fines shall have been previously paid.  Which
amount shall be paid out of the funds of the company
as soon as the amount on hand to the credit of this
contract shall equal the maturity value hereof; or the
holder may at such times accept in cash full settlement
for this contract the amount in the funds of the com-
pany standing to the credit hereof.  (8)  Should the
holder of this contract fail to pay an installment when
due, before the holder has obtained the use or advance-
ment of any money provided herein, a fine of ten (10)
cents for each month of default shall be imposed until
all over-due installments and fines shall have been paid;
provided, however, if he shall fail to pay the said install-
ments and fines for the term of (2) two consecutive

months after default, then this contract shall be wholly
null and void and of no effect, and all payments paid
thereon shall be forfeited and the aggregate amount
of all payments thereon shall be retained by the com-
pany as agreed liquidated damages for the nonperform-
ance of the contract by the holder; time, manner, and
amount of payment being the essence of this con-
tract. . . ."

*McWillie & Thompson, J. C. Ward* and *R. N. & H. B.
Miller,* for appellant.

It is perfectly clear from the record that not a single
person was ever fraudulently induced to contract with
defendant and if any person can be said from the testi-
mony to have contracted with appellant without under-
standing the contract, he did so because of his own negli-
gence and want of attention, and not because of wrong-
doing by the company.

No person, therefore, was defrauded, unless it shall
be adjudged that the contract itself is so vicious and
illegal as to amount in law to a fraud. We understand,
and our understanding is supported by the terms of the
decree of the court below, that the chancellor adjudged
as a matter of law that the contract itself was of that
character.

In our judgment the merits of this case lies in the con-
tract itself, and nine-tenths of this ponderous record is
wholly immaterial matter. There is nothing on the face
of the contract, as distinguished from the "Benefits,
Provisions and Requirements" printed on the back of it,
worthy of mention. Certainly it does not evidence any-
thing usurious, illegal or wrong in any way, and, in
fact, the charge that the contract was and is usurious
was so completely disproved that it was practically aban-
doned in the court below and the assailment of the con-
tract was almost wholly, if not entirely, directed to the
provisions printed on the back of it. That the contract

was a hard one, if that be true, did not warrant the injunction prohibiting its being made. But the contract upon its face is not a hard one, certainly it is not hard upon the borrower or purchaser who performs his obligations under it. If the contract be expressed in terms hard to understand, the circumstance cannot be invoked by the state to prevent persons who do understand it, or who think they understand it, from entering into it, any more than the state can intercept any other obscure contract. Obscurity is by no means the same as illegality. But, were the contract illegal, the parties to it are not without remedy in the courts and illegality does not of itself warrant the interposition of a court of equity. We have seen that there is nothing illegal on the face of the contract and we will now pass to a consideration of the provisions printed upon its back. It will be well at the outset to note that the customers of the company may be, and necessarily are, divided into three classes; first, those who purchase the contracts simply as an investment, without intent or effort to obtain a loan; second, those who purchase with intent of borrowing money, and who, having complied with their obligations to that end, actually obtain loans, thereby ceasing to be contract holders and become borrowers, pure and simple, and third, those who purchase contracts, fail to comply with their obligations and consequently are denied loans, with possibly a fourth class, those who purchase contracts in order to obtain a loan, who comply with their obligations and are entitled to but are denied a loan for the full sum sought or delayed in obtaining it. Some of the provisions printed on the back of the contract relate to these separate classes of customers.

Much stress was placed in the court below by appellee's counsel upon a claim that the controversies touching loans which have arisen between defendant and the number of persons who have testified complainingly of

their individual grievances practically demonstrate that the contract itself is vicious. In respect to this we have to say that the construction of the contract is for the courts and not for the witnesses; that not one of them have ever judicially established that he had been wronged by defendant; that the courts have been and are open to them, and the defendant has the right to defend each and every cause brought against it in a separate action, without being embarrassed by having to answer a multitude of suits all in one cause and all merely collaterally involved therein. That these grievances are all personal to the complaining witnesses and do not invest the state with a cause of action, and no number of such business controversies, singly or all combined, authorize the state to enjoin the carrying on by defendant of a business which is not unlawful.

Coming now to the authorities. The case in the books nearest in application to the case at bar is the case of *Equitable Loan & Trust Co.* v. *Waring* (Ga.), 62 L. R. A. 108.

There are many differences between that case and this one which are to our advantage as these differences tended to render the contract and scheme there passed upon illegal and their probative force is wanting here. There the aggrieved parties were complainants, suing for themselves and all others in like position; here the state is the complainant; there the postoffice department (as shown by the opinion of the trial judge approved in the dissenting opinion) of the United States government had at one time excluded the company from doing business through the mails on the ground that its business was a lottery; here the bill avers the same thing; the averment was denied and was disproved, and the appellant company was permitted to and did use the mails at liberty. Even this decision by the trial judge, approved in the dissenting opinion, affirms that if the scheme of the company were legal and its contracts valid,

deceptions practiced on certificate holders, if proved, would not require the appointment of a receiver. There the company was not adjudged to be solvent; here the company's solvency is adjudged and determined.

In that case the applications were numbered as they were received at the office of the company, but, unlike this case, each application did not entitle the applicant, after performing the obligations necessary thereto, to a loan in their order, but the same was determined, according to the trial judge's finding of fact, by some sort of a scheme of chance, a table of numbers called "numerals" which he decided to be a lottery. In this case there was no such scheme; each was to receive a loan in the order of his application; one of the tests of a lottery as shown by the trial judge's opinion in the Georgia case is that thereby "one gets more than another similarly situated;" here that is not the case. The applications were acted upon and honored, if entitled to be honored, in the order in which they were received by the company "first come, first serve" is the rule, and one first coming is not similarly situated with one coming after him. All customers of defendant company were and are given equal (and not unequal) advantages. In the Georgia case (as found by the trial judge) the defendant's business was to issue a large number of certificates or promises to pay, and their payment depended absolutely upon the chances of many lapses or forfeitures. In this case the company's scheme did not depend upon lapses or forfeitures. We append to this brief a statement from which it distinctly appears that if there were not a single lapse or forfeiture the company could meet each of its obligations and yet make money for its stockholders. The trial judge in the Georgia case, 62 L. R. A. 108, formulates the grounds upon which he ruled the contract there presented to be unlawful, viz., the use of chance, prizes, thus amounting in his opinion to a lottery, and the fact that the whole

scheme depended on lapse or forfeitures. Here we have no element of chance, no prize and no dependence on lapses, or forfeitures.

We have called attention to these distinctions between the Georgia case and the one at bar for two-fold purposes, first, to show that our case is not within the reasoning of the trial judge's opinion, approved in the dissenting opinion, in that one, and, second, to show that the controlling opinion by Cobb, J., delivered in that case, and concurred in by a majority of the court, is *a fortiori* the more applicable to the question before this court.

The first paragraph of the opinion of the supreme court of Georgia (62 L. R. A. 113) shows that the trial court had adjudged the scheme there under review to be, first, a lottery, or in the nature of a lottery, and therefore illegal and, second, that it was impossible of performance by legal methods. We have no such case before this court. The majority opinion in the Georgia case shows (although that contract was much stronger against the company than the one here involved) that the contract there under consideration was not a lottery nor in the nature of a lottery and that it was not incapable of performance. The argument of the Georgia supreme court is so very able and full that it relieves us of labor, and this court is earnestly asked to carefully read it, weigh its arguments and apply it to the case. We make it a part of this brief.

Counsel in the court below counted much on the case of *State* v. *New Orleans Debenture, etc. Co.* (La.), 26 South. 586; but that case is so different from the present one as to be readily distinguished. The debenture company was not a loan company at all; its customers were all investors pure and simple, and the scheme absolutely depended on lapses and forfeitures. The court said "All calculations—show that loss is inevitable, unless 'lapses and forfeitures' are to be considered as fac-

101 Miss.—29

tors of revenue to an extent to which the defendant itself does not contend." The company had not been mismanaged, or to use the language of the supreme court of Louisiana, "We think the management was good enough. None the less it has fallen behind—all, we believe, because the plan is not feasible." And the court said in another place in the opinion, "Its assets are much less than its liabilities." It was, therefore, insolvent. Appellant company is solvent, adjudged by the court below to be solvent. It has done and was doing when enjoined a prosperous business. Its plan is feasible.

While the Louisiana case may be authority for a suit by the state to enjoin a business under an invalid charter from carrying on a business contrary to the public policy it has no application in this case where defendant was operating under a valid charter and where its business was not dependent upon lapses and forfeitures.

Appellee's counsel also counted upon *State* v. *Nebraska Home Co.* (Neb.), 60 L. R. A. 448. This case was one in which there were no mere investors, but all customers sought to become borrowers. The Nebraska court seems to have misapplied the decision of Judge Woods in *McDonald* v. *United States,* 63 Fed. 426, touching the numbering of applications. It will be seen in the case decided by Judge Woods that the bonds were not payable in their numerical order at all, but their order was determined by a chance device. Judge Woods said, "There are four numerals to every multiple, and it follows that a bond (which might as well be called a ticket) bearing a high multiple number will be entitled to payment sooner than three-fourths of the bonds bearing lower numbers among the numerals and the further the process is carried, the greater becomes the disparity between the multiple and the numerals next to be paid, and correspondingly the bonds numbered with numerals, except as benefited by lapses, become less and less valuable, because the day

of possible payment becomes more and more remote."
Their number one was first payable, number five next,
number two next, number ten next, and so on, alternat-
ing between numerals so called and multiples of. five, ex-
cept that between every fourth and fifth of the multi-
ples no numerals intervene.  Of course, under such a
scheme the element of "chance" was patent.  The Ne-
braska case ignores the entire point to Judge Wood's
decision and seems to find an element of chance where
none existed in the order in which the application was
received by the company, and the trial judge in the
Georgia case fell into the same palpable error.

The Nebraska case, to further note it, was one in which
by the operation of its scheme the borrowers were post-
poned for an unreasonable length of time and the con-
tract was impossible to perform in this world, and it
did not undertake to furnish its customers a home in
the next one.  That case is not authority against us,
since appellant's contracts are capable of performance
on this earth and there can be no pretense of such un-
reasonable delay, seventy years, as appeared in the Ne-
braska case.

Of course, "first come, first serve" is an equitable
rule and a lawful one.  It no more depends upon chance"
than many other important legal affairs of life.  To ad-
judge the making of loans in the order of applications
for them a "lottery" would extend lotteries beyond all
reason and make nearly everything in life a "lottery."

The Ohio case, *State ex rel., etc.* v. *Interstate Saving
& Investment Co.*, 52 L. R. A. 530, cited by appellee in
the court below is so different from the case at bar as
to distinguish itself.  It is a case where the business
was dependent wholly on lapses and forfeitures and it
contained in the judgment of the court a lottery scheme
for which it was condemned.

The case cited in the court below by appellee's counsel,
*Enterprise Savings Association* v. *Zumstein*, 64 Fed.

837, simply decides that the courts will not review the discretion and judgment of the postmaster-general in discontinuing the use of the mails by a party, because in his judgment the business of the party constituted a lottery. This and nothing more. Of course, the decision is not authority in the present case.

*Cassedy & Butler,* for appellee.

No brief for appellee found in the record.

Argued orally by *R. H. Thompson,* for appellant.

Argued orally by *Geo. Butler,* for appellee.

SMITH, J., delivered the opinion of the court.

Appellant, a loan company, by means of attractively worded literature and by representations made by its soliciting agents, seeks to induce the public generally, and prospective customers particularly, to believe that all purchasers of what it styles its "investment, home purchasing contract" will receive loans from the company upon easy terms with which to purchase homes. (The reporter in reporting this case is directed to set out this contract, together with sections 5, 7, and 8 of the "Benefits, Provisions, and Requirements" printed on the back thereof.) While this contract ostensibly has an investment feature of a vague and indefinite character, contained in section 7 of the "Provisions, Benefits, and Requirements," the loan feature thereof is the principal inducement held out to the public and because of which these contracts are purchased. The funds out of which loans are to be made, and from which only the company is required to make them, consists of eighty per cent. of the monthly payments made by the purchasers of contracts, excluding the first three payments, plus transfer fees, interest, and return payments on loans. The first dollar which the purchaser pays goes to the company's agent, who solicits the contract, as his

commission.  The next three monthly payments of one dollar each and twenty per cent. of all payments made thereafter go to the company and become its property absolutely.  When a loan is made to the purchaser of a contract, he ceases to make any further payments thereon, and thereafter his payments are in return of the money borrowed, with interest.  The addition by the borrowers to the loan fund consists of only the interest on the money borrowed.  It is utterly impossible, therefore, for the company to comply with its promise to make loans to all purchasers of its contracts.  The language in which the opinion in the case of *Fidelity Funding Company* v. *Vaughn*, 18 Okl. 13, 90 Pac. 34, 10 L. R. A. (N. S.) 1123, is couched, is strikingly applicable here, although the case itself can be distinguished from the case at bar.  Changing this language slightly the ability of appellant to make loans depends almost entirely upon the number of contracts sold; the monthly payments made on the new contracts being used to make loans to holders of earlier contracts.  The sale of new contracts must constantly increase at a high progressive rate in order that such loans may be made, and, it being impossible to continue this indefinitely, the end must come sooner or later, and, when it does come, the more successful the business up to that time, the greater the number of contracts to make loans which the company will be unable to fulfill.  In the language of *Public Clearing House* v. *Coyne* (C. C.), 121 Fed. 929, it is a literal demonstration of the old saying, "The devil takes the hindermost."  Since appellant's organization in 1906 up to October, 1910, eleven thousand, one hundred and sixty persons have applied to it for ninety-six thousand, six hundred and thirty-two contracts.  Most of these applications have fallen by the wayside, there being now outstanding eight thousand contracts, owned by one thousand, two hundred and thirty-three persons.  The number of loans made by the company in this time is

one hundred and seventy, and of the one thousand, two hundred and thirty-three owners of contracts, three hundred and eight only are eligible. Truly, "Many are called, but few are chosen."

It being impossible for the company to make loans to all purchasers of its contracts, its promise so to do evidences an intention to defraud, and consequently the whole course of its business constitutes such a systematic violation and abuse of the rights and privileges conferred upon it by its charter as to justify either the revocation of its charter, or the issuance of a writ of injunction, enjoining the further prosecution of such business. The court therefore committed no error in granting the injunction.

The court did err, however, in appointing a receiver; for, unless there is a statute so providing, the court, in proceedings of this character, is without power to appoint a receiver or trustee to wind up the affairs of a corporation. 5 Thompson on Corporations, Sec. 6353; 2 Clark & Marshall on Private Corporation, Sec. 334, subd. "h;" 3 Cook on Corporations (6 Ed.), Sec. 863. Section 4029 of the Code of 1906 provides for the appointment of such a trustee, but only after judgment of forfeiture and ouster.

*Reversed and remanded.*

Anderson, J. (dissenting).

I shall very briefly set down the grounds of my dissent. The state has no more to do with the affairs of a corporation chartered by it, except to forfeit its charter when violated, than it has to do with the private affairs of any individual within its borders. The state's only concern is to see that such a corporation does not violate, misuse, or abuse its charter. It will not forfeit the charter of a corporation because it is engaged in a dishonest business, provided, of course, in the prosecution of such business its charter is not violated. The

state will not undertake such a fatherly care over the affairs of the people as that it will prevent a corporation from entering into contracts with them which are improvident and unreasonable. The state is not called upon to litigate strictly for the vindication of private interests. The courts are open to all who have grievances against corporations. There they can obtain redress without calling on the state to espouse their cause.

The business and assets of a corporation belonging to its stockholders, which is not to be destroyed and rendered worthless at the instance of the state, except on the clearest and most convincing evidence that its charter is being violated. Here we have a corporation, prosperous and amply solvent. It has assets subject to the process of the courts. Any investor who is aggrieved has his remedy, and there is property to satisfy any judgment he may recover.

In the majority opinion it is held that the whole course of the business of this company is fraudulent, and constitutes an abuse of its charter. In my judgment the contract (investor's contract) is perfectly valid; that it is an absolute promise to pay each investor at the end of eighty months one hundred dollars for every eighty dollars paid in by him. Construing the contract most strongly against the company, as must be done under the law, it can have no other meaning. But even though that be not the proper construction, and conceding that the contract means a promise to pay the investor only his *pro rata* share of the earnings of the loan fund, still I do not see that that would render it invalid. Such a contract may be unreasonable, but that does not signify that it is illegal. Investors buy these contracts with their eyes open. They are notified by the company not to pay any attention to what the agents say, but to read the contract. It is argued on behalf of appellee that the scheme of the company will not "finance out," and a majority opinion holds that new contracts must con-

stantly increase at a high progressive rate in order that loans may be made, and this cannot be continued indefinitely, and therefore the end must come sooner or later. It seems to me a complete answer to this is that the record in this case shows that the scheme has already "financed out." After about three years of experience the company has demonstrated its ability to meet all obligations. In my opinion not a single authority relied on by counsel for appellee sustains their contention. The contracts and the character of business under consideration in those cases were so widely different from the case here as to render those authorities without point. On the other hand, though the facts in the case of *Equitable Loan & Security Company* v. *Waring,* 117 Ga. 599, 44 S. E. 320, 62 L. R. A. 93, 97 Am. St. Rep. 177, are materially different in some respects from the facts of this case, the reasoning of the court is able and convincing and decisive of the question here.

I am unable to see that the whole course of the business of this company is fraudulent. It may be that its contracts are unreasonable and unjust, and the people ought not to patronize it, but, if that is all, I do not see that it is any of the state's concern.