# UTAH STATE FAIR ASS'N et al. v. GREEN et al.

No. 4443. Decided Aug. 6, 1926. (249 P. 1016.)

*Irvine, Skeen & Thurman,* of Salt Lake City, for appellant Utah Horse Breeding & Racing Ass'n.

*Harvey H. Cluff,* Atty. Gen., *J. Robert Robinson,* Asst. Atty. Gen., and *H. L. Mulliner,* of Salt Lake City, for other appellants.

*William H. Folland,* City Atty., and *Shirley P. Jones* and *W. A. Fraser,* Asst. City Attys., all of Salt Lake City, for respondents.

254

THURMAN, J.

This is an appeal by the plaintiffs from a judgment in favor of defendants made and entered under the Uniform Declaratory Judgments Act (chapter 24, Sess. Laws Utah 1925). The purpose of the action is to test the constitutionality of chapter 77, an act passed at the same session of the Legislature.

As the question presented involves the validity of both the title and body of the act, we herewith quote the act at length:

"An act relating to horse racing, and providing for the creation of a state racing commission and defining its powers and duties and repealing all acts and parts of acts in conflict therewith.

"Be it enacted by the Legislature of the state of Utah:

"Section 1. *Holding Horse Races.* Any individual who complies with the provisions of this act and any association or corporation which complies with the terms of this act, and which association or corporation, if formed or organized for the purpose of racing and breeding, or improving the breed of horses and conducting races and contests of speed, shall have the right to hold one or more racing meets in each year and to hold and conduct races and contests of speed by and between horses at such meetings.

"Section 2. *Two Meets Annually—Time Limit.* No more than two meetings shall be held in any one county in any one calendar year, and no meetings shall last longer than thirty racing days from the day of the commencement thereof.

"Section 3. *State Racing Commission—Membership—Payment.* There is hereby created a state racing commission which shall consist of three members to be appointed by the Governor, two of whom shall serve for a period of two years, and one for a period of four years. The commission shall appoint one of its members as chairman and another of its members as secretary. The compensation of the members of the Commission shall be $30 per day for the chairman and $20 per day for each of the other members, for each racing day for any meet held under the provisions of this act. This salary shall be paid from the fees collected by the commission as in this act provided.

"Section 4. *Licenses—Fees.* The commission is hereby granted the authortiy to issue licenses to persons, associations and corporations

desiring to conduct racing meets, to provide rules and regulations for the holding of such meets, to prescribe the amount of and collect the fees to be paid for holding the same; provided, however, that said commission shall not collect a fee in excess of $500.00 for each racing day that said races are held. The commission shall also have the power and authority to revoke for cause any license granted to any individual, association or corporation to hold such racing meets.

"Section 5. *License Necessary.* It shall be unlawful for any person, association or corporation to hold any racing meet without first having obtained a license from the said state racing commission as in this act provided.

"Section 6. *Betting Permitted—Restriction.* It shall be unlawful to make or place any wager on the result of any race held under the provisions of this act; provided, however, that bets or wagers under the co-operative or pari-mutual system of betting and wagering shall not be unlawful, and said co-operative or pari-mutual system of betting or wagering on the results of said races shall be under the regulations of the commission.

"Section 7. *General Repeal.* All acts or parts of acts in conflict herewith are hereby repealed."

The pleadings of the parties and stipulations entered into by them are unduly prolix, in view of the questions to be determined. We shall not assume the task of either stating them in substance or setting them out in detail. As we view the case, a brief statement of the relation of each of the parties to the questions involved showing their interest therein is all that is necessary in this connection. Matters of special interest may be referred to in the course of the opinion, should it become necessary so to do.

The State Fair Association, plaintiff, is a state institution, existing by authority of both the Constitution and laws of the state. It was organized to promote, and is engaged in promoting, in the state of Utah, the breeding and improvement of the breed of horses, as well as of other live stock, and the advancement of agriculture, horticulture, mining, manufacturing, and the domestic arts and sciences. It is the owner of real estate and improvements thereon situated in Salt Lake City, and county known as the state fair

grounds, and has included therein a race track designed for use in the conduct of the sport known as horse racing, and has legislative authority to use, and permit the same to be used, for stock shows, Wild West tournaments, race meets, and other purposes.

The plaintiffs B. F. Grant, J. H. Waters, and Gage B. Rodman are the duly appointed, qualified, and acting racing commission of the state of Utah, under and in pursuance of the act (chapter 77). hereinbefore quoted.

The defendant Utah Horse Breeding and Racing Association, a Utah corporation, has acquired a large stock farm in Davis county, Utah, and has included therein a race track for the purpose of operating race meets under and in pursuance of chapter 77, supra, and for that reason was made a party to this action. The defendants Herman H. Green, Arthur F. Barnes, C. Clarence Neslen, T. T. Burton, and Harry L. Finch, as city commissioners of Salt Lake City, are charged with the duty of seeing that the valid ordinances of said city are enforced, and among said ordinances is one making it an offense to bet on horse races within the limits of Salt Lake City. In view of the findings of the court, the relation of the other defendants is immaterial.

In the summer of 1925, the plaintiff State Fair Association, being duly licensed by the state racing commission, under the provisions of chapter 77, supra, held a race meet on the state fair grounds, and several horse races were had thereon, and betting allowed, as provided in section 6 of the act. The license of said plaintiff State Fair Association covers a period of several years, and it contemplates holding one or more race meets on said fair grounds in each and every year during the term of its said license, and permit betting on horse races under the provisions of said act.

Section 6 of the act in question, if valid, repeals by implication the ordinances of said city making it an offense to bet on the result of horse races within the limits thereof, and the defendant city commissioners, prior to the commencement of this action, threatened to arrest and prosecute all

persons violating said ordinances, the provisions of chapter 77, supra, to the contrary notwithstanding.

This action, as hereinbefore stated, was instituted by plaintiffs to determine the constitutionality of the act and to restrain the aforesaid threatened arrests and prosecutions.

The contention of the city commissioners is, first, that section 6 of the act in question violates article 6, § 28, of the state Constitution, which declares:

"The Legislature shall not authorize any game of chance, lottery or gift enterprize under any pretense or for any purpose."

Second, that it violates articles 6, § 23, of said Constitution, which provides in part:

"No bill shall be passed containing more than one subject which shall be clearly expressed in its title."

It is also contended that section 6 of the act violates article 6, § 26, of the Constitution which prohibits the Legislature from enacting any private or special law:

"Granting to an individual, association or corporation any privilege, immunity, or franchise."

The trial court, to whom the case was tried, made findings of fact, and as conclusions of law therefrom found that the act "is a constitutional and valid enactment by the state of Utah except as to section 6, which is not covered by or included within the title, and is therefore unconstitutional, void, and of no effect, being in violation of article 6, § 23, of the state Constitution." The trial court also found as conclusions of law that horse racing is not a game of chance, lottery, or gift enterprise, and that section 6 of the act does not grant to individuals, associations, or corporations any privilege, immunity, or franchise, and that therefore said section is not in contravention of article 6, § 23, or section 26, of the state Constitution.

Judgment was entered for the defendant city commissioners in accordance with the findings and conclusions. Plaintiffs appeal therefrom, and defendants file cross-assignments, challenging as error the finding of fact and conclusions of law made by the court adverse to their contentions.

There was comparatively but little oral evidence taken at the trial. The case, in the main, was tried upon the pleadings and stipulations entered into by the parties.

As the court views the case, the great majority of the stipulations submitted to the court were wholly immaterial to any legitimate issue in the case. It was stipulated by the parties, and found by the court, that the contention of the plaintiff was that horse racing is a game of skill, while the contention of defendants was that it is a game of chance. This stipulation of the parties and finding of the court narrows the issues to a single question as far as concerns the first objection urged by the defendants.

Much appears in the pleadings, stipulations, and findings as to the property interests involved, the profits that will accrue to the plaintiffs and to the taxpayers of the state in operating under the provisions of the act, and the great financial loss that will be sustained by plaintiffs and the state if the act is declared to be unconstitutional. Much is said in argument by respondents' counsel to the effect that section 6 of the act is in conflict with the moral traditions and time-honored policy of the state. Such questions, in some cases, might have considerable weight in determining the probable intent of the Legislature in the passage of particular statutes, but we are unable to perceive what possible relevancy such matters can have in determining the questions presented in the instant case. The immediate question here is: Is horse racing, as contemplated in section 6 of the act, a game of chance? If it is not, then section 6 is not in contravention of article 6, § 28, of the state Constitution. With that thought in view, the court will first address itself

to the question: Is horse racing, as contemplated in the act, a game of chance? Every presumption must be indulged in favor of the constitutionality of the act; every reasonable doubt must be resolved in favor of its constitutionality. This proposition is elementary in this jurisdiction and in every jurisdiction of the country.

It appears to be conceded that the great weight of judicial opinion throughout the country is to the effect that horse racing is a game. The parties here differ only on the question as to whether the game as contemplated in section 6 is a game of chance. The writer assumes that thousands of people in this commonwealth, like himself, have but little or no knowledge of the full scope and meaning of the terms pari-mutual system employed in section 6 of the act. As the real bone of contention here is the effect of conducting horse races under the pari-mutual system, it becomes necessary to quote at some length the findings of the court thereon. Concerning the races run on the state fair grounds in July, 1925, we quote the following from finding No. 10:

"In the operation of said pari-mutual system the betting or wagering is limited to the particular race to be next run. Prior to the running of the race, the booths of the ticket sellers are opened, and the public invited to place their bets or wagers upon the winning horses of the next race. There are fourteen of such booths open where persons can bet severally in denominations of $2, $5 and $10 each on 'straight,' 'place,' or 'show,' as used in racing parlance to indicate the position of the horses at the end of the race as coming in either first, second, third, respectively. There is no limit to the number of such bets any individual might make, except the limitation of the better's purse or inclination, time, or supply of tickets. Subject to such control as the law gives to the state racing commission, a device known as the pari-mutual machine was placed behind each ticket seller, and has the appearance of a blackboard, with the name and number of each horse which is to run in the next race. Immediately under each name and number is an open space wherein numbers can be registered. As bets are placed with the ticket seller, the operator of this machine registers the bet, and the indicator under the name and number of each horse shows the number of bets placed upon each horse respectively. As bets are received, the bettor is given a ticket indicating the number of the horse upon which he places his money, such number corresponding

to the number beside the horse's name on the face of the machine. It also indicates the amount of the bet and the position the bettor has indicated the horse will take at the end of the race, that is, whether 'straight,' 'place,' 'show,' or 'combination,' of such places. Immediately before the race is started, ticket selling is stopped by the officials of the racing association, and the officials of the pari-mutual system compute the total amount of money placed in the pool. A commission of 10 per cent. of the whole pool is deducted, which percentage is regulated and controlled, and may be changed at any time by the Utah racing commission. Computation is also made to show the ratio the bets on each horse bear to the whole amount of money in the pool, and thus is indicated the odds in favor of or against each horse. The machine records the number of tickets issued on each horse and the total of the tickets so issued on all horses in the race. The odds are indicated and determined on the amount of money placed and the odds or the amount to be paid on any horse cannot be determined until after the last ticket on the race has been purchased. When the race is finished the computers of the pari-mutual system make announcement of the amount that will be paid on each bet upon the horse coming in first, second or third, and public announcement is made by means of a large blackboard of the number of the horses winning, together with the odds to be paid the holders of tickets who have placed their money on such winners. The winning tickets are then presented to cashiers who pay out to each winner the amount as computed by the officers of the system. A further deduction is made and kept by the operators of the system which is known as the 'breaking of the dime,' that is, if the amount computed to be paid to the winner on a two dollar bet should be $2.68, the amount paid would be $2.60, the odd pennies being retained. As soon as the race is finished the name of the horses in the next race are posted on the pari-mutual machines and the public is again invited by outcry and blackboard announcements to place their bets on the next race."

In finding No. 9 the court finds:

"The pari-mutual is not operated separately from the races, and is a recording device that is not used to play a game by itself."

It appears that the pari-mutual performs no function in determining the result of the game. This subject will receive further attention before concluding our opinion.

On the proposition as to whether horse racing, or betting on horse races, is a game of chance or a game of skill, the

authorities are not as conclusive as could be desired by one charged with the duty of deciding the question. The cases, as matter of course, arise under varying statutes, and the decisions are as variable as the statutes under which they are rendered. Each of the parties here has referred to numerous authorities upon which they rely as supporting their respective contentions. None of the authorities cited are conclusive upon the question under review, so that in the last analysis the court will perhaps be compelled to rely to a great extent upon the rule of reason and common sense. Appellant cites the following authorities:   27 C. J. 968; 12 R. C. L. 716; *State v. Vaughan*, 81 Ark. 117, 98 S. W. 685, 7 L. R. A. (N. S.) 900, 118 Am. St. Rep. 29, 11 Ann. Cas. 277; *State v. Ayers*, 49 Or. 61, 88 P. 653, 10 L. R. A. (N. S.) 992, 124 Am. St. Rep. 1036; *State v. Hayden*, 31 Mo. 35; *McCall v. State*, 18 Ariz. 408, 161 P. 893, Ann. Cas. 1918A, 168; *Louisville v. Wehmhoff*, 116 Ky. 812, 76 S. W. 876, 79 S. W. 201; *Cheeks' Case*, 79 Ky. 359; *James & Gamble v. State*, 63 Md. 242; *James v. State* (Okl. Cr. App.) 113 P. 226, 33 L. R. A. (N. S.) 827; 14 Am. & Eng. Enc. Law (2d. Ed.) 684; 2 Cyc. Law & Proc. 473.

In 27 C. J. at page 968, § 4, the author says:

"The phrase 'game of chance,' it has been said, is not one long known in the law and having therein a settled signification. It is a game determined entirely or in part by lot or mere luck, and in which judgment, practice, skill, or adroitness have honestly no office at all, or are thwarted by chance; a game in which hazard entirely predominates."

In 12 R. C. L. at page 716, supra, the same rule is announced in substance, and illustrated by numerous examples, as follows:

"A 'game of chance' is said to be such a game as is determined entirely or in part by lot or mere luck, and in which judgment, practice, skill, and adroitness have honestly no office at all, or are thwarted by chance; as, for example, games with dice which are determined by throwing only, and those in which the throw of the dice regulates the play, or in which the hand at cards depends on a dealing with the face

down, are instances of games of chance. On the other hand, games of chess, checkers, billiards, and bowling are deemed to be games of skill. This distinction has obtained in all those jurisdictions where the definition of the term 'game of chance' has been material under their statutory law. Throwing dice is purely a game of chance, and chess is purely a game of skill. But games of cards do not cease to be games of chance because they call for the exercise of skill by the player, nor do games of billiards cease to be games of skill because at times, especially in the case of tyros, their result is determined by some unforeseen accident, usually called 'luck.' The test of the character of the game is not whether it contains an element of chance or an element of skill, but which of these is the dominating element that determines the result of the game."

In 7 L. R. A. (N. S.) 900, supra, the note refers to *Harless v. United States,* Morris (Iowa) 169, 172, 173 (the page in the Iowa report should be 225). At page 229 the court says:

"Penal statutes must not be construed to embrace cases not clearly within their provision. The word 'game' does not embrace all uncertain events, nor does the expression 'games of chance' embrace all games. As generally understood, games are of two kinds, games of chance and games of skill. Besides, there are trials of strength, trials of speed, and various other uncertainties which are perhaps no games at all, certainly they are not games of chance. Among this class may be ranked a horse race. It is as much a game for two persons to strive which can raise the heaviest weight, or live the longest under water, as it is to test the speed of two horses."

Further on in the opinion, on page 230, the court says:

"It is said that there are strictly few or no games of chance, but that skill enters as a very material element in most or all of them. This, however, does not prevent them from being games of chance within the meaning of the law. There are many games the result of which depends entirely upon skill. Chance is in no wise resorted to therein. Such games are not prohibited by the statute. But there are other games, which although they call for the exercise of much skill, still there is an intermingling of chance. The result depends, in a very considerable degree, upon sheer hazard. These are the games against which the statute is directed, and horse racing is not included in that class. We think, therefore, the indictment in this case charged no indictable offense against the defendants."

In *State v. Hayden,* supra, it is said by the court:

"It is a great perversion of language to call a horse race a gambling device. If the Legislature desire to prohibit horse races, it is easy for them to say so in plain terms. No one would even suppose that penalties inflicted upon keepers of faro banks, and tables, and such like gaming devices, were intended to apply to horse races, or foot races, or boat races."

*McCall v. State,* supra, is not of special interest here, except that it decides that pari-mutual is not a gambling device, nor is it the game in and of itself, because it does not determine the result. When used in connection with a horse race, the horse race is the game. In this connection we quote the following from the opinion, at page 895 (18 Ariz. 413) :

"Where the game is played with cards, the cards themselves determine who is the winner and who is the loser.. This is likewise true with dice. An information charging that the gambling was with cards or dice or with any other well-known instrumentality, which in and of itself determines the contest, would doubtless state a public offense under the statute. As was said in the case of *People v. Engeman,* 129 App. Div. 462, 114 N. Y. S. 174; Id., 195 N. Y. 591, 89 N. E. 1107; 'This is the test: Whether the implement or device is used in determining who shall win or lose; whether it is an integral part of the actual gambling. A 'gambling device' is defined (20 Cyc. 871) as an 'invention often used to determine the question as to who wins and who loses, that risk their money on a contest or chance of any kind; anything which is used as a means of playing for money or other thing of value, so that the result depends more largely on chance than skill.' "

In *James v. State,* 63 Md. at pages 252, 253, a system called "mutual pools" was used in connection with horse racing. The system was very similar to the pari-mutual in the case at bar. After describing the system and discussing statutes relating to games of chance, the court used the following language:

"We are now prepared to examine the evidence which was admitted in the criminal court. If the persons, who purchased the tickets in the various pools, were playing at a game of chance, then the appellants were keeping a gaming table, and a place for gambling. The object of purchasing these tickets was to wager money on certain horse

races. No ordinary interpretation of language would describe their conduct as the playing of a game. When a man hazards his money on the rise or fall of prices of stocks, cotton, grain, or other commodities, it cannot in the proper use of language be said that he is playing at a game of chance, nor can the place where such ventures are made and registered be designated as a gambling table. Bets are made, and money hazarded on many of the uncertainties and contingencies of life, but in the common use of language, these transactions are not called games of chance. The contingency on which these appellants wagered their money was the result of a race; in one event they would win, in another they would lose. It may be said that many elements of uncertainty were involved in the wager by reason of the various combinations which might be made in the pools. But nevertheless the thing which was to determine gain or loss was the success of the horses chosen. If by any singular subtlety of discourse a horse race could be shown to be a game of chance; by the same reason we must hold that it was played on the race course, and that the horses were the players."

There are many questions of interest discussed in the other cases cited by appellants, especially cases involving the pari-mutual system, but, as we view the question here, it is not necessary to make special reference to such cases. In most of them the Legislatures were not restricted by constitutional provisions. Other propositions relied on by appellants will be briefly noticed before concluding our opinion on this branch of the case.

We now pass to a consideration of authorities relied on by respondents. Before citing respondents' cases, their position can be best stated by quoting the following from their brief:

"The precise question here is whether the pari-mutual system of betting or wagering upon horse races where the horse races are operated in connection with and as a part of the pari-mutual system is a game of chance. In this case it is not necessary to consider whether a horse race by itself is a game of chance or whether the pari-mutual machine by itself is a gambling device. It is stipulated, and the court has found, that the pari-mutual system is operated in connection with the running of races; that the commissions and profits derived from the pari-mutual system of betting or wagering is used in furnishing prizes or purses to the winners, and defraying other expenses incident to the

operating of races. It also appears that the same corporation operates both the pool selling and the horse races; that the operation of the races determines who wins in the pari-mutual pools; that the pari-mutual pools are operated for the purpose of financing the races. While it is perfectly clear that horse races can be run without the pari-mutual system of betting or any other scheme of betting, and that the pari-mutual system of wagering and betting can be used with respect to baseball games, dog races, or other games, yet there is no question here but that both are operated together and that each are an indispensable factor in the operation of the system of betting and wagering as carried on pursuant to the Redd Racing Act."

Counsel for respondents then refer to several authorities as to what constitutes a game, showing that horse racing is included. As already stated, appellants concede that such is the weight of authority. Upon the question whether horse racing, as provided in the act in question, is a game of chance, respondents first refer to 11 C. J. 277, for the definition of the word "chance," and to 27 C. J. 973, for the meaning of the word "bet," as these words are used in the cases, after which respondents cite the following cases in support of their contention that horse racing as provided in the act in question is a game of chance: *Tollett v. Thomas* (Eng.) 6 L. R. Q. B. Cas. 514; *Miller v. United States,* 6 App. D. C. 6; *State v. Ayers,* 49 Or. 61, 88 P. 653, 10 L. R. A. (N. S.) 992, 124 Am. St. Rep. 1036; *State v. Nease,* 46 Or. 433, 80 P. 897; *People v. Weithoff,* 51 Mich. 203, 16 N. W. 442; *Opinion of Justices,* 73 N. H. 625, 63 A. 505, 6. Ann. Cas. 689; *James v. State* (Okl. Cr. App.) 113 P. 226, 33 L. R. A. (N. S.) 827; *Thompson v. Hayes,* 59 Misc. Rep. 425, 111 N. Y. S. 495; *Ellison v. Lavin,* 179 N. Y. 164, 71 N. E. 753, 66 L. R. A. 601; *Public Clearing House v. Coyne,* 194 U. S. 497, 24 S. Ct. 789, 48 L. Ed. 1092; *Waite v. Press Pub. Ass'n,* 155 F. 58, 85 C. C. A. 576, 11 L. R. A. (N. S.) 609, 12 Ann. Cas. 319; *Fidelity Funding Co. v. Vaughn,* 18 Okl. 13, 90 P. 34, 10 L. R. A. (N. S.) 1123; *McCall v. State,* 18 Ariz. 408, 161 P. 893, Ann. Cas. 1918A, 168; *Everhart v. People,* 54 Colo. 272, 130 P. 1077; *Salt Lake City v. Doran,* 42 Utah, 401, 131 P. 636.

In *Tollett v. Thomas,* supra, an English case decided in 1871, the defendant was charged with violating a statute which provided "that any person playing or betting in a public place, with any table or instrument of gaming at any game of chance, is liable to be convicted as a rogue and vagabond." It appears that the game was a horse race conducted under the pari-mutual system, substantially the same as in the case at bar. In discussing the question as to whether it was a game of chance, Chief Justice Cockburn, who wrote the opinion, at page 521 of the report said:

"In the present instance, an element of chance is introduced, which, though not having any reference to the main event—namely, the result of the race in the winning of a particular horse—is yet essential in making the wager laid upon the winning horse profitable to the better. The winning of the horse betted upon is of course the primary condition of the wager being won, but whether the winning of the wager shall be productive of any profit to the winner, and more especially what the amount of that profit shall be, depends upon the state of the betting with reference to the number of bets laid on or against the winning horse—a state of things fluctuating from one minute to another throughout the duration of the betting. Now this being something wholly in dependent of the issue of the race, as well as of the will and judgment of the winner, depending, as it does, on the will or caprice of the other persons betting, is a matter obviously of uncertainty and chance to the individual better, more especially in the earlier stages of the betting. There being, then, this element of chance in the transaction among the parties betting, we think it may properly be termed, as amongst them, a game of chance."

In *Miller v. United States,* supra, the District of Columbia case, it was held that book-making on a horse race was a game of chance or gambling device within the meaning of the Act of Congress of January 31, 1883 (22 Stat. 411). The case was decided in March, 1895. As indicating the views of that court, we quote the following language from the opinion (at page 13):

"This statute of 1883 was not aimed exclusively at any particular game or species of device for gaming, but was intended, as its title and its broad comprehensive provisions declare, more effectually to suppress gaming in this district. The reason and policy of the law,

as well as its comprehensive language, apply as well to all games and devices then existing as to all that might be subsequently devised and practiced. That being the object to be accomplished, what could be more grossly obnoxious to the provisions of the statute, or more demoralizing to the community, than the existence of places for the making and selling of books and pools upon horse races, baseball games, foot races, dog fights, cock fights, and all other conceivable contests upon which money may be bet or wagered. The great evil and vice of the thing is not in the horse race, the foot race, or the baseball game, but in the seductive allurements held out to people, young and old, to frequent the gaming table, or the gambling device, and to indulge in excessive betting, and thereby become the victims of the wily and scheming professional gambler. Whether the game or contest upon which the wager is made be a horse race, foot race, baseball game, or what else, it is quite immaterial, if the thing or contest upon which the bet or wager is made be a game of chance. It has from an early time been held that a horse race is a game of chance, and so is a game of baseball, and so a foot race, where wagers have been made upon them"—citing cases.

The two cases just considered appear to be fairly in point on the question under review. We refer to them separately, in this connection, because the remaining cases are not squarely in point. They afford us but little assistance in arriving at a definite conclusion.

*State v. Weithoff,* supra, decided in July, 1883, is, perhaps, the next in order of analogy. The defendant was indicted under a statute making it a misdemeanor to keep for gain a gaming room or gambling table, or any game of skill or chance, or partly of skill and partly of chance, used for gaming, etc. The particular games charged in the indictment were baseball and horse racing. In concluding the opinion, the court, by Mr. Justice Cooley, said:

"The word 'game' is very comprehensive, and embraces every contrivance or institution which has for its object to furnish sport, recreation, or amusement. Let a stake be laid upon the chances of the game, and we have gaming. Eminent judges have thought the pooling scheme was to be considered a game (*Tollett v. Thomas*, L. R. 6. Q. B. 514; *Scollans v. Flynn,* 120 Mass. 271 273), and it was so decided in *Edwards v. State,* 8 Lea [Tenn.] 411. It does not furnish sport, recreation, or amusement, except so far as the excitement of the choice

of chances may furnish it; but this is true of many contrivances, which are always called games, and which the law aims to suppress. There is no good reason for a distinction between pooling and such games."

It cannot be determined from the opinion whether the court regarded the games referred to as games of chance entirely, or partly games of chance and partly games of skill. It must be true that even in undoubted games of skill there is always an element of chance, or it would not be called a game. The question is, therefore, which is the predominating element, chance or skill? R. C. L. and C. J., supra.

What we have said respecting the Michigan case, just reviewed, applies with equal or greater force to the remaining cases cited by respondents. Most of the statutes controlling in such cases make betting or gambling or keeping or maintaining a place where betting or gambling is permitted a crime. It makes no difference whether the game is horse racing, baseball, billiards, chess, or other games, usually classed as games of skill or whether it is games with cards, with slot machines, roulette wheels, or throwing dice, all of which are uniformly held to be games of chance. The statutes simply prohibit gambling and the maintenance of rooms and places for that purpose. The cases therefore are not very helpful in the instant case. As we said near the beginning of the opinion, it is a case in which after all, it is necessary to rely largely on the rules of reason and common sense, coupled with such light as may be reflected by adjudicated cases.

In the opinion of the court, if games such as horse racing, baseball, billiards, chess, and other games in which there is a basis for the exercise of judgment, learning, experience and skill, must be classed as games of chance, even though there may be an element of chance, then we are unable to determine what constitutes a game of skill as contradistinguished from a game of chance. Unless we apply the rule announced in C. J. and R. C. L., supra, and determine the question by ascertaining which is the dominating element

of the game, then there is no reasonable rule by which the question can be determined.

In the instant case it is conceded that the result of the race is determined by the race itself, and not by any machine or other device. Everything else being equal, the fastest horse will be the first to reach the goal. That determines the winners on "straight." The next two in order determine the winners on "place" and "show." If this were all, there could be no reason founded in law, as we view the authorities, for contending that the race is a game of chance. But the amount of each better's winnings cannot be foretold at the time he registers his bet. The number of persons who may bet afterwards at the same machine is unknown. This, it would seem, is an element of chance, at least to a limited extent. It is not an element of chance as to the amount he may lose, but only as to the amount he may win. If his horse wins, he knows in advance that he cannot lose more than 10 per cent of the amount he has bet, and that could only occur in case every better bet on the same horse. In such case, notwithstanding they win the race, 10 per cent under the rules of the game now in force is deducted from the total sum. So that the chance feature of the game has nothing to do with whether the better wins or loses the race, for as before stated, that depends on the race itself, independent of the pari-mutual machine. Neither does the chance feature in any manner affect the amount he will lose, for this he can foresee at the time he registers his bet.

It seems to the court that the dominating element of the game is the race itself. The trial court found it was a game of skill, and as conclusions of law found it was not a game of chance, and, therefore, not prohibited by the Constitution. Before concluding, however, upon this question, there are one or two other points urged by appellants which we will briefly notice: When this provision of the Constitution was under consideration by the constitutional convention, a motion was made to strike it out, whereupon a colloquy was had among certain delegates germane to the motion. The

proceedings of the constitutional convention (volume 1, pp. 937, 938) read as follows:

"Mr. Evans (Weber): Mr. President, I am entirely opposed to the striking out of this section. There is no doubt but what if this section is stricken out there will be a combination of people who will importune our incoming Legislature for the purpose of securing a franchise to carry on lotteries and games of chance. I believe that such institutions are wrong in principle. I believe that we ought to put an inhibition upon the Legislature to permit a thing of this kind. My friend from Salt Lake says that Legislature cannot be bamboozled into granting such a franchise. I say, let us make a prohibition in the Constitution so that they will not even consider the question at all. I am opposed to the striking of it out, and will vote against it.

"Mr. Hammond: Let me ask the gentleman from Weber a question: Will this prohibit horse racing? I am very fond of horse racing. I never bet much on it, but I am fond of it.

"Mr. Evans (Weber): No; it will not according to the construction of the courts.

"Mr. Hammond: Then I am satisfied."

Mr. Evans was a lawyer of recognized ability. There were four other lawyers who participated in the discussion: Mr. Eichnor, Mr. Bowdle, Mr. Van Horne, and Mr. Varian. None of them challenged the correctness of the statement made by Mr. Evans in answer to Mr. Hammond, and the motion to strike was rejected.

In answer to this point made by appellants, counsel for respondents in their briefs say in part:

"If it were our contention that horse racing by itself were unlawful, then this discussion might shed some light upon the intention of the Constitution makers."

It goes without saying that the constitutional convention was not considering inhibiting games of chance played just for amusement. Betting and gambling was what it had in mind; otherwise the proceeding would have been downright piddling, so that whatever force or effect this colloquy may be entitled to in determining the intention of the convention, it must, in all fairness, be conceded that it had in mind the

question of gambling on a game of chance, and also the question as to whether or not horse racing was included. Mr. Evans said it was not, and Mr. Hammond expressed his satisfaction. If any other delegate was dissatisfied with Mr. Evans' statement, it nowhere appears in the proceedings of the convention.

In view of the limitations imposed upon this court in passing upon the constitutionality of an act of the Legislature, as well as in view of the investigation we have made of the subject, we are not warranted in holding that the trial court erred in finding that section 6 of the act (chap. 77, Laws 1925) is not in contravention of the state Constitution.

2. Respondents also challenge the validity of the act on the alleged ground that it does not comply with article 6, § 23, of the state Constitution, which provides in part:

"No bill shall be passed containing more than one subject which shall be clearly expressed in its title."

The title of the act in question is:

"An act relating to horse racing, and providing for the creation of a state racing commission and defining its powers and duties and repealing all acts and parts of acts in conflict therewith."

It is contended by respondents that section 6 of the act, providing for the pari-mutual system, and prohibiting other forms of betting on races authorized by the act, is a separate and distinct subject of legislation, and is not covered by, or included in, the title. If such contention is sound, then section 6, and every provision thereof, is unconstitutional and void. The trial court decided this question in favor of respondents, and the ruling of the court thereon constitutes appellant's sole ground of appeal from the judgment.

In determining this question, the rule hereinbefore announced applies, that every reasonable doubt must be resolved in favor of the constitutionality of the act. This rule

and other rules applicable to this very question, is comprehensively stated in several brief paragraphs in *State v. Johnson*, 90 Okl. 21, 215 P. 945. Omitting the authorities cited, the language is as follows:

"In determining whether the above section of the statute is violative of any of the foregoing constitutional provisions, we should do so in the light of the following universal canons of construction, viz.:

" 'That the presumption is in favor of the constitutionality of a statute.' * * *

" 'That any and all reasonable doubts and every reasonable doubt as to be the constitutionality of a statute will be resolved in favor of its validity.' * * *

" 'That the presumption in favor of the constitutionality of a statute will be indulged in by the courts until the contrary is clearly shown.' * * *

" 'That it is not within the province of the judiciary to question the wisdom or motives of the lawmaking body in the enactment of a statute.' * * *

" 'That courts will presume that the Legislature in passing a statute was cognizant of the facts relating thereto and familiar with the existing conditions sought to be remedied.' "

This provision of our Constitution has been under review by this court in numerous cases since its adoption in 1896. *Ritchie v. Richards*, 14 Utah, 345, 47 P. 670; In re Monk, 16 Utah, 100, 50 P. 810; *Nystrom v. Clark*, 27 Utah, 186, 75 P. 378; *Marioneaux v. Cutler*, 32 Utah, 485, 91 P. 355; *Edler v. Edwards*, 34 Utah, 13, 95 P. 367; *Salt Lake City v. Wilson*, 46 Utah, 60, 148 P. 1104; *State v. Hammond*, 46 Utah, 249, 148 P. 420; *Martineau v. Crabbe*, 46 Utah, 327, 150 P. 301; *State v. McCornish*, 59 Utah, 58, 201 P. 637; *State v. Olson*, 59 Utah, 549, 205 P. 337; *Mutart v. Pratt*, 51 Utah, 246, 170 P. 67.

In all of the above-cited cases, where there was occasion for an extended review, the limitations stated in the Oklahoma case, supra, have been recognized and observed. Nevertheless, the constitutional provision in question is a salutary provision. It was wisely adopted, and should not be lightly regarded. As said in *Ritchie v. Richards*, supra:

"The object may be a general one, however, and it may be stated in terms sufficiently comprehensive to embrace every means and end necessary or convenient for the accomplishment of the general purpose. Their purpose is not fragmentary legislation, however, nor will they permit subjects to be included not connected with the general purpose, not necessary or convenient as a means to the general end."

It is also stated as follows in *Martineau v. Crabbe,* supra, at page 336 (150 P. 304) ;

"Manifestly the purpose of this provision of the Constitution is to prevent the Legislature from intermingling in one act two or more separate and distinct propositions—things which, in a legal sense, have no connection with, or proper relation to, each other. The reasons for, and the scope of, constitutional provisions of this character, are well illustrated in 26 Am. & Enc. Law (2d Ed.) 575, in the following language:

" 'This requirement of singleness is not intended to embarrass honest legislation, but only to prevent the vicious practice of joining, in one act incongruous and unrelated matters; and, if all the parts of a statute have a natural connection and reasonably relate, directly or indirectly to one general and legitimate subject of legislation, the act is not open to the objection of plurality, no matter how extensively or minutely it deals with the details looking to the accomplishment of the main legislative purpose.' "

It is said in Cooley's Constitutional Limitations (6th Ed.) pp. 170, 171:

"The practice of bringing together into one bill subjects diverse in their nature and having no necessary connection, with a view to combine in their favor the advocates of all, and thus secure the passage of several measures, no one of which could succeed upon its own merits, was one both corruptive of the Legislature and dangerous to the state. It was scarcely more so, however, than another practice, also intended to be remedied by this provision, by which, through dexterous management, clauses were inserted in bills of which the titles give no intimation, and their passage secured through legislative bodies whose members were not generally aware of their intention and effect. There was no design by this clause to embarrass legislation by making laws unnecessarily restrictive in their scope and operation, and thus multiplying their number; but the framers of the Constitution meant to put an end to legislation of the vicious character referred to, which was a little less than a fraud upon the public and to require that in every

case the proposed measure should stand upon its own merits, and that the Legislature should be fairly satisfied of its design when required to pass upon it."

These being the purposes which render it necssary to incorporate such a provision in the Constitution, it is incumbent upon the Court to give due consideration to such purposes whenever the question arises in any particular case. In doing so, however, a liberal construction should be given to the act with the view of maintaining its constitutionality. This rule, in substance, is quoted with approval from a Wisconsin case by this court in *Marioneaux v. Cutler, supra,* at page 486 (91 P. 358), as follows:

"As already observed, the subjects of legislation are usually expressed with the utmost brevity and conciseness in these titles, and some consideration must be given to this circumstance in determining the question. The court is not to set aside or declare an act void because the subject was not as fully or as unequivocally expressed as it might otherwise have been. A liberal rule of interpretation must prevail in this respect, not only for the reason just stated, but because the proposition is to strike down and defeat the act of the Legislature, which can never be done on slight or untenable grounds. It is a truth which has been often asserted and often acted upon by the courts that to justify the annulling of a statute by judicial sentence the violation of the Constitution must be clear and unmistakable."

Appellants invoke another rule applicable to cases of this kind, and cite in support thereof 25 R. C. L. at page 853, where the author says:

"It is primarily for the Legislature to determine whether the title of an act shall be broad and general or narrow and restricted, and the broader and more general the title the greater the number of particulars or of subordinate subjects which may be embraced within it."

This rule received recognition by this court in *Marioneaux v. Cutler,* supra, at page 486 (91 P. 358), where the court quotes the following from a Minnesota case:

"The connection or relationship of several matters, such as will render them germane to one subject and to each other, can be of various kinds, as for example, of means to ends, of different subdivisions of the

same subject or that all are designed for the same purpose, or that both are designated by the same term. Neither is it necessary that the connection or relationship should be logical. It is enough that the matters are connected with and related to a single subject in popular signification. The generality of the title of an act is no objection, provided only it is sufficient to give notice of the general subject of the proposed legislation, and of the interests likely to be affected. The title was never intended to be an index to the law."

In *Edler v. Edwards,* supra, at page 18 (95 P. 368), substantially all of the foregoing rules are collected together and presented in a comprehensive statement by Mr. Justice Frick, speaking for the court:

"The courts are, however, unanimous with respect to the following general rules to be observed: (1) That the constitutional provision now under consideration should be liberally construed; (2) that the provision should be applied so as not to hamper the lawmaking power in framing and adopting comprehensive measures covering a whole subject, the branches of which may be numerous, but where all have some direct connection with or relation to the principal subject treated; (3) that the constitutional provision should be so applied as to guard against the real evil which it was intended to meet; (4) that no hard and fast rule can be formulated which is applicable to all cases, but each must to a very large extent be determined in accordance with the peculiar circumstances and conditions thereof, and that the decisions of the courts are valuable merely as illustrations or guides in applying these general rules. Moreover, it is now established beyond question that unless the invalidity of a particular law in question is clearly and manifestly established the law must prevail as against such an objection. If, therefore, by any reasonable construction, the title of the act can be made to conform to the constitutional requirements, it is the duty of the courts to adopt this construction rather than another (if the title be open to more than one construction) which will defeat the act. 1 Lewis' Suth. Stat. Const. (2d Ed.) §§ 115-127, and cases there cited. In case of doubt it must be assumed that the Legislature understood and applied the title so as to comply with the constitutional provision, and not contrary thereto. If, after applying such a reasonable construction the title is insufficient, or the subject is plural, then the law must fail. The provision is mandatory, and may not be ignored."

The title of the act in the instant case is "broad and general," as contradistinguished from "narrow and restricted;"

that is to say, the title does not purport to state the details of the act, but only the general subject of legislation. Horse racing is the subject in general. The creating of a state racing commission and prescribing its duties is a part of the general subject and included within it. If it is unmistakably clear that a pari-mutual system of wagering is not germane to the subject, as stated in the title, or is so foreign to the subject as to constitute a distinct subject of legislation, then the act is in contravention of article 6, § 23, of the state Constitution, and respondent's contention should be sustained.

As illustrating the application of this rule, we refer to a few of the cases decided by this court:

In *Ritchie v. Richards,* supra, the title of the act was "An act relating to and making sundry provisions concerning elections." Laws 1896, c. 125. The body of the act provided that the Governor might fill certain vacancies by appointment. It was held by the court that this provision of the act was not covered by the title and not a compliance with the constitutional provision in question.

In *Marioneaux v. Cutler,* supra, the title of the act was "An act fixing the salaries of judges of the district court." Laws 1903, c. 86. Section 1 of the act fixed the salary at $4,000 per annum, and provided that no mileage or expenses should be allowed. Appellant contended that the title did not cover the question of mileage and expenses, and that the proviso was therefore unconstitutional. The court held otherwise, and sustained the validity of the act.

In *State v. McCornish,* 59 Utah, 58 201 P. 637, the defendant was convicted of the crime of "pandering" under a statute the title of which was "An act to amend section 3, c. 108, Laws of Utah 1911, relating to receiving money from fallen women." Laws 1915, c. 6. The contention was made in this court that "pandering" and "receiving money from fallen women" were distinct crimes and distinct subjects of legislation and that the act was therefore obnoxious to the constitutional provision invoked in the case at bar. This

court, however, held that, while "the subjects included in the act may be distinct in one sense, nevertheless they are cognate and related to each other and are properly included in one act under one title."

The authorities relating to this class of cases indicate great reluctance in declaring statutes unconstitutional, especially as to the provision of the Constitution in question here. In the very nature of the question it is manifest that the foundation for such objection is oftentimes more specious than real, in that no substantial right may be involved. Out of the twelve Utah cases we have examined in which this objection has been made in only one has the objection been sustained. Nevertheless, this fact is in no sense controlling, and is referred to only as illustrating the reluctance on the part of the courts to which we have referred.

It would seem unnecessary to refer to authorities from other jurisdictions as our own decisions appear to be in harmony with the general law. A few references, however, to other authorities on features pertinent here may be illuminating. Appellants call our attention to the following:

39 Cyc. p. 1042, under the title "Statutes," in which the author, referring to public officers, says:

"Public Officers.—Title of acts are generally held to be valid covering public officers, their powers and duties, and their compensation and fees."

See, also, note 94 on the same page, illustrating what is germane.

In speaking of the particularity required in stating the object, it is said in Cooley's Constitutional Limitations (6th Ed.) at page 172:

"The general purpose of these provisions is accomplished when a law has but one general object, which is fairly indicated by its title. To require every end and means necessary or convenient for the accomplishment of this general object to be provided for by a separate act relating to that alone, would not only be unreasonable, but would actually render legislation impossible. It has accordingly been held

that the title of 'an act to establish a police government for the city of Detroit,' was not objectionable for its generality, and that all matters properly connected with the establishment and efficiency of such a government, including taxation for its support, and courts for the examination and trial of offenders, might constitutionally be included in the bill under the general title."

To the same effect is Lewis' Suth. Stat. Const. p. 184, §§ 117, 121; *Gaare v. Board of Comm.*, 90 Minn. 530, 97 N. W. 422; *Leslie v. Bracken*, 154 Ala. 151, 45 So. 841; *Baltimore & O. R. Co. v. Town of Whiting*, 161 Ind. 228, 68 N. E. 266; *Commissioners v. Hellen*, 72 Md. 603, 20 A. 130. See, also, note in 64 Am. St. Rep. Title "Officers;" *Sweet v. City of Syracuse*, 60 Hun, 28, 14 N. Y. S. 421; *Anderson v. Board of County Commissioners*, 67 Colo. 403, 186 P. 286; *Jackson v. Bell*, 143 Tenn. 452, 226 S. W. 207; *Republic I. & S. Co. v. State of Indiana*, 160 Ind. 379, 66 N. E. 1005, 62 L. R. A. 138. See, also, last index of L. R. A. Notes covering L. R. A. for 1918, subd. 13, title "Statutes." See, also, *State Racing Comm. v. Latonia Agricultural Ass'n*, 136 Ky. 173, 123 S. W. 681, 25 L. R. A. (N. S.) 905; *Grainger et al. v. Douglas Park Jockey Club*, 148 F. 513, 78 C. C. A. 199, 8 Ann. Cas. 997; *State v. Del Mar Jockey Club*, 200 Mo. 34, 92 S. W. 185, 98 S. W. 539; Ex parte Hernan, 45 Tex Cr. R. 343, 77 S. W. 225.

Respondents, without challenging the correctness of the rules announced in the authorities above cited, contend, nevertheless, that they have no application to the instant case. They refer to two or three cases which it is contended are more in point: *Hale v. Belgrade Co.*, 74 Mont. 308, 240 P. 371; *State v. Johnson*, 90 Okl. 21, 215 P. 945.

In *Hale v. Belgrade Co.*, supra, the Legislature of Montana, in 1925, passed an act under the following title:

"An act to amend section 9746 of the Revised Codes of Montana of 1921, relative to the authentication of copies of appeals to the Supreme Court and concerning abbreviated records on appeal to the Supreme Court of Montana." Laws 1925, c. 19.

At the time of the passage of the act certain rules of the Supreme Court provided as follows:

"1. Record on Appeal. Appellant is charged with the duty of having the transcript perfected and filed with the clerk of the court in accordance with the statute and these rules.

"2. Time of Filing. The transcript shall be filed by the appellant with the clerk of the court within sixty days after such appeal has been perfected; or the appeal will be subject to dismissal on motion of the adverse party; but if it appear that the delay has been without laches on the part of the appellant, his appeal will not be dismissed for such delay, until reasonable time has been allowed for filing the record."

Section 9746, referred to in the title, was re-enacted literally, and the following words added thereto by way of amendment:

"In all cases where no bill of exceptions is presented for settlement in the trial court the party appealing shall file his transcript in the Supreme Court within sixty days after such appeal is perfected; and in cases where a bill of exceptions is settled in the trial court the party appealing shall file his transcript in the Supreme Court within sixty days after such bill of exceptions has been settled."

The statutes of Montana, the same as here, provide that an appeal shall be taken within six months from the entry of judgment. It will thus be seen that the new act not only shortened the time within which the transcript could be filed, but, as stated by the court, repealed by implication, or at least modified, the section which permitted an appeal to be taken within six months from the entry of judgment. The time within which the transcript could be filed in the Montana case had expired under the new statute, but had not expired under the rule. Respondent moved to dismiss the appeal, and invoked the new statute as authority. Appellant assailed the validity of the statute on the ground urged in the case at bar; the provision of the Montana Constitution being identical with article 6, § 23, of the Utah Constitution. Counsel for respondents here quote the following excerpt

from the opinion of the Montana court (74 Mont. 316, 240 P., at page 373) :

> " 'No person reading the title (to this act), whether a member of the Legislature or a private citizen,' would be justified in concluding that the intention of the Legislature was to abrogate the rules of this court regarding the time within which transcripts in all appeals shall be filed, nor would he gather therefrom that this act had slumbering in its bosom this important change in appellate procedure which had theretofore been regulated solely by the rules of this court; nor that the Legislature intended thereby to shorten the time within which an appeal from a judgment might be taken. Here, also, that knowledge could only be gained by an examination of the entire amandatory act and of the subject of appellate procedure as found in the Revised Codes, as well as the rules of this court."

With profound respect for the decisions of that court and a due appreciation of its standing and ability, we cannot accept the rule announced in that case as authoritative in this jurisdiction. Whenever a section of a Code or revision is to be amended, this court is committed to the rule that the title of the amendatory act is sufficient, if it specifies the section to be amended without further reference, if the legislation is germane to the section. In *Edler v. Edwards,* supra, in which a similar question was involved, this court (34 Utah, at page 20, 95 P. 368), quotes with approval section 414, Lewis' Sutherland, Stat. Const. as follows:

> "It is held by the great majority of cases that it is sufficient for the title of an act to amend a Code or revision to specify the section to be amended, without giving the title of the chapter or division to which it belongs or in any way indicating the subject-matter * * * which is germane to the section specified."

See, also, *State v. McCornish,* supra.

Under the rule just quoted, we are of opinion the decision of the Montana court is not in harmony with the weight of authority. But, assuming the decision to be correct, it is clearly distinguishable from the instant case, in that the title of the act in that case is "narrow and restricted," while

in this case, as before stated, the title is "broad and general." In that case the title refers specifically to certain matter in the section to be amended, and does not include shortening the time within which the transcript should be filed or the appeal taken. In such case the maxim exclusio unius, etc., applies.

In *State v. Johnson,* supra, the same constitutional question was involved as in the instant case. Under the Constitution of Oklahoma and laws made in pursuance thereof relating to banking, a depositors' guaranty fund to insure depositors against loss in case a bank failed had been established and was in operation when the new law was enacted. The new law provided in effect that, where a surety company pays, or is compelled to pay, a deposit of any state, county, municipal, or other public funds for which such surety company is liable on the failure of any bank, such surety company is entitled to participate in a pro rata division of the funds of the assets of any such bank with the depositors' guaranty fund. The title of the new act was as follows:

"An act to amend sections 267 and 272 of chapter 6, article 1, of the Revised Laws of the state of Oklahoma of 1910, and to amend section 3, chapter 22, Session Laws of 1913, providing penalties for violations of the banking laws of this state, and to define the powers of the state banking board, and for other purposes; and declaring an emergency." Laws 1915, c. 58.

The action arose in a case where the bank commissioner, who had paid the surety company its pro rata share under the act, sued the stockholders on their liability as stockholders. They defended on the ground that the act was unconstitutional in the respects above mentioned. The Supreme Court affirmed the judgment of the trial court, holding that the act was unconstitutional, and, in the course of the opinion, at page 949 (90 Okl. 26), said:

"The title to the statute under consideration does not indicate, or, standing alone, does not even intimate, that the body of the act con-

tains a provision whose tendency is to defeat the central purpose of an economic policy of the state. We are not holding that the Legislature would have had no power to enact the statute in question, if it appeared to the Legislature that there was a public demand for such provision, but do hold that the title materially fails in expressing the subject of the act."

That case is also one in which the title of the act was to amend certain sections of the Revised Statues of the state, and, under the rule announced by this court in the Edler Case, supra, and by Lewis' Sutherland in the excerpt quoted, would probably be held constitutional in this jurisdiction. But it is a close question even upon that proposition, for the policy of the commonwealth to provide for the security of depositors and stockholders by some sort of a guaranty seems to have been declared in the Constitiution itself as well as by a statute enacted in pursuance thereof. Provision for the protection of surety companies had not theretofore been provided for in either the Constitution or the statutes. But the court in the excerpt quoted did not deny the power of the Legislature to enact such law had it done so in a proper manner.

Whether or not in that case the subject expressed in the title covers and includes the matter legislated upon in respect to permitting surety companies to participate in the guaranty fund depends entirely upon the subject-matter of the sections which were amended, and whether or not the amendment was germane to the sections amended. We have not deemed it necessary to investigate this feature of the case.

Respondents make the further point that article 6, § 28, of the Constitution, which prohibits games of chance, etc., is a separate subject in and of itself, and is made so by the Constitution. We have held, however, that horse racing under the pari-mutual system is not within the constitutional inhibition.

We have thus far endeavored to consider every pertinent

authority presented for our consideration. We have now to determine from our examination of ■■ the authorities and such reason as we possess whether or not the statute in question is subject to the objection that it is in violation of article 6, § 23, of the Constitution. In determining this question, the thought we expressed near the beginning of this opinion applies here with equal, if not greater, force. Neither the economic nor moral effect of our determination of this question has any place in our deliberations. We speak of them solely because they are so vigorously stressed and relied on by both appellants and respondents. These are questions with which we have nothing to do in the instant case. They belong to a co-ordinate branch of the state government—the Legislature—and, as said by the court in *State v. Johnson,* supra:

"It is not within the province of the judiciary to question the wisdom or motives of the lawmaking body in the enactment of a statute; * * * that courts will presume that the Legislature in passing a statute was cognizant of the facts relating thereto and familiar with the existing conditions sought to be remedied."

Having found that horse racing under the pari-mutual system is not a game of chance, and not inhibited by the Constitiution, the question whether or not it shall be authorized by law is purely a matter of legislative policy—a rightful subject of legislation. So that it must be conceded that the Legislature had the power to pass an act regulating the manner in which horse racing should be conducted at races authorized by the act, and in connection therewith had the power to prescribe a system of betting on the result thereof, and prohibit every other form of betting thereon. If we consider this question with these thoughts in mind, unhampered by other considerations with which we have nothing to do, we will have a clearer conception of the real question we have to determine. Prior to the passage of the act in question there was no state law prohibiting betting on horse races between individuals at any time or place in the state. There was a law against pool selling, making it a felony, but

no law against pool buying. There was a law against book-making, making it a felony also. There was also a law making it a felony to maintain a place for conducting any of the aforesaid inhibited things. The act in question, if valid, repeals the law making pool selling unlawful, for the pari-mutual system is undoubtedly a form of pool selling, and the act in question repeals all laws in conflict therewith. Instead of prohibiting pool selling, as under the old law, the new act permits pool selling by the pari-mutual system under rules and regulations made by the state racing commission, created by the act, and at the same time makes unlawful other forms of betting on races held under the provisions of the act.

The question in the last analysis is: What relation, if any, does the pari-mutual system authorized by section 6 bear to horse racing and the creation of a state rac- ■ ing commission, which is the subject expressed in the title? The definition of pari-mutual, as given in the Century Distionary, is:

"A pool in betting, as in a horse race, in which each bettor lays a fixed sum on the contestant that he selects, and those who choose the winners divide the entire stake, less the percentage of the person who furnishes the pool tickets; literally mutual bets."

The definition in the Standard Dictionary is precisely the same.

Webster's New International Dictionary defines it as follows:

"Mutual stake or wager. A form of betting on horses in which those who bet on the winning horse share the total stakes less a small percentage to the management."

6 Words and Phrases, p. 5174, gives the following definition:

" 'Paris mutual' is also called 'French pool,' " and is described to be a small machine containing the name of each horse to be run in

the particular race, written or printed on the side, and printed numbers placed on the inside of a machine which can be seen through holes in it. It is used by the owner or person operating it, and by those engaged in betting on horse racing in this way: The owner or operator sells the tickets for $5 each. They bear numbers corresponding with the number given the horse on the machine, and by turning a crank or screw attached to the machine the betters are shown at once the number of tickets sold on each horse, as each of said tickets is sold, so as to enable him to bet intelligently and safely, and lessen the chance of disaster to himself." *Commonwealth v. Simonds*, 79 Ky. 618, 619.

Wherever we have found the word or term in our research, whether in dictionaries or in adjudicated cases, it refers to horse races as illustrative of its ■ meaning. The writer has found in one or more cases statements by the courts that it is a system that may be used in baseball games as well as in horse races, but I have thus far found no case in which the system was used other than in horse races and that as described in the findings of the court quoted. This being the case, we are of opinion this court would be going a long way to hold that the title of the act in question here is defective because it does not expressly state that betting on horse races under the pari-mutual system will be permitted. This court, in the opinion of the writer, would be altogether too reserved in its opinion if it did not admit that it is a matter of common knowledge that wherever and whenever horse racing occurs, and especially when what is called race meets are held, there is betting in some form or other on the result. So that the very term "horse race" or "horse racing" is suggestive of some form of betting, either by bookmaking, selling pools, or individual betting. This was the mischief to be remedied, and it was for the Legislature to regulate it in accordance with its own views in any manner not prohibited by the Constitution.

There is another point deserving of brief consideration before concluding the opinion. The title of the act expressly refers to the fact that the act creates a "state racing commission," and defines its powers and duties. There is au-

■

thority for the proposition that such a title is sufficient to cover the powers and duties conferred and imposed by the act. 36 Cyc. 1042, 1043, hereinbefore cited, and cases referred to in the note. In such case the fact that the title expressly mentions the public office created, and that its powers and duties are defined in the act, would seem that such title would be sufficient notice to any person who might be interested in learning what powers were being conferred and what duties were being imposed. In this connection we quote, among the many stipulations, entered into by the parties, upon which the case was mainly tried:

"That the operation of the said pari-mutual system in connection with said races is necessary for the successful conduct of racing meets, and that the purpose of said act as set forth therein cannot be pro moted or successfully carried out without the operation of the said system so authorized."

We are not disposed to give much effect to the last clause of the stipulation above quoted, because the purpose of an act may be entirely foreign to the subject expressed in the title. Indeed, it is just such cases that are obnoxious to the constitutional provision in question. But we cannot avoid the conclusion that the first clause of the stipulation is entitled to considerable weight in determining whether or not the title is a sufficient compliance with the Constitution. There certainly can be no doubt that "horse racing" is the subject of the act, and that it is clearly expressed in the title. Nor can there be any doubt that "racing meets" is germane to the subject. If, therefore, the operation of the pari-mutual system is germane to the subject expressed in the the successful conduct of "racing meets," it ought to follow as a necessary corollary that the operation of the pari-mutual system is germane to the sugject expressed in the title. But, entirely independent of the stipulation, whatever may be its meaning and effect, we are far from being satisfied beyond a reasonable doubt that the act contains more than one subject of legislation or that the subject of the act

is not clearly expressed in the title. We are therefore of the opinion that the findings and conclusions of the trial court upon this question were erroneous, and cannot be sustained.

It is also contened by respondents, under their cross-assignments, that section 6 of the act is in contravention of article 6, § 28, of the state Constitution prohibiting lotteries and gift enterprises, and section 26 of the same article, subdivision 16, hereinbefore quoted. We are of opinion there is no merit in these contentions, and deem it unnecessary to discuss the question in detail.

It is manifest that a new trial of the case would not result in a different conclusion. It is therefore ordered that the cause be remanded, with directions to the trial court to reverse the judgment, and enter judgment in favor of appellants, with costs.

GIDEON, C. J., and CHERRY, J. concur.

STRAUP, J.

I concur. We must take the Constitution as we find it, neither enlarging nor detracting from it. It merely provides that the Legislature shall not authorize "any game of chance, lottery, or gift enterprise." It does not forbid the Legislature authorizing betting, wagering, or gaming. Nor does it forbid the Legislature authorizing any game, except a "game of chance;" That is, the Legislature, if it sees fit, may authorize any game not a game of chance, and at the same time may authorize or permit wagering or betting on it. The wisdom of the Legislature authorizing or permitting betting or wagering of any kind, whether on a game of skill or otherwise, or on any event, or to permit any kind of public betting or wagering, may well be questioned, and concerning which minds of men may well differ. I am in perfect accord with those who assert that public betting and wagering are pernicious and baneful and ought to be forbidden. But the question of wisdom is one of legislative policy over which we have no control.

The Legislature may adopt any kind of policy not forbidden by the Constitution, and whether a given policy adopted by it not so forbidden is wise or unwise, wholesome or unwholesome, moral or immoral, are questions exclusively within the province of the Legislature. Hence betting, wagering, and gaming not being forbidden by the Constitution, it is competent for the Legislature to authorize and permit or to forbid and prevent any and all kinds of betting, wagering, or gaming, whether private or public.

It, in effect, is conceded that horse racing within and of itself is like foot racing, boat racing, football, and baseball, a game of skill and endurance, a contest involving skill and judgment, and not a game of chance, and that it is within legislative power to authorize and permit it. That the Constitution does not forbid the Legislature from authorizing or permitting horse racing any more than foot racing, football, or baseball is not seriously doubted by any one.

Now, from these considerations, I do not see wherein the fact of wagering or betting on the result of a game, or wherein the means or device by which the betting or wagering is carried on or conducted, has anything to do with the determination of whether the game is one of chance or of skill. In other words what does betting or wagering on the result of a game have to do with the character of it? It seems to me a game of football or baseball is a game of skill whether any betting or wagering is laid on its result or not. Nor, as it seems to me, does it make any difference by what method or device the betting or wagering is carried on or conducted. So, too, with respect to horse racing. As pointed out by Mr. Justice THURMAN, the pari-mutual method or system of betting in no particular determines or affects the result of the race. It is merely a convenient means by the use of levers and mechanical appliances of registering, recording, and tabulating the bets and a ready means of displaying in the stages or progress of the betting the number and kinds of bets, all of which may as well, though perhaps not as conveniently, be done by charts and blackboards.

The same kind of system, with proper variations, might be used in betting on games of football or baseball, or on any other kind of contest with a number of contestants, but usually when employed is, so far as made known to us, applied to horse racing only. It so is defined by lexicographers. The device used in the pari-mutual system of betting is not like a slot machine, or roulette wheel, or other similar device or instrument which by its manipulation or operation itself determines the result. The device merely registers or records and displays the bets as they are made. It is a mere posting of them. They could as well be marked by chalk or pencil on a board or chart displayed in a conspicuous place, and by the use of the one no more than by the other system is the result of the race determined nor the character of it as to skill or chance influenced or affected. Thus I think the respondents misconceive and misstate the main proposition for consideration when they say, as they do, that "the precise question here is whether the pari-mutual system of betting or wagering upon horse races where the horse races are operated in connection with and as a part of the pari-mutual system is a game of chance." As I conceive the proposition, it is: Is horse racing a game of chance or a game of skill? If it is a game of chance, that is the end of the inquiry. If it is a game of skill, it is rendered a game of chance by permitting betting or wagering, whether by the pari-mutual system or by any other method, on the result of the race. Since betting or wagering on the race does not determine or affect the result of it, I think the conclusion inevitable that wagering or betting on the result of a game of skill does not convert the game into one of chance. As well say that, while football is a game of skill, yet if wagering or betting on the result of the game is permitted, it becomes a game of chance. Horse racing thus being a game of skill and not a game of chance, it was competent for the Legislature to authorize, permit, and regulate it, which really no one disputes. Nor does any one seriously question the wisdom of some sort of legislation on the subject. What

in fact is questioned amounts not to legislative power but legislative wisdom in permitting public betting and wagering on horse racing, or on any other game though of skill. On that subject the respondents, and all those in accord with them, must seek legislative, and not judicial, relief.

The argument that horse racing is not successful unless the pari-mutual system of betting is also permitted, but means that horse racing is not successful—that it is not profitable or remunerative, or interesting—unless betting or wagering on the result of the race or races is permitted. Such considerations have no relevancy. Whether a game is operated successfully or unsuccessfully, profitably or unprofitably, is not a material, nor even a relevant factor in determining whether it is a game of chance or skill. Surely, if a game is operated unsuccessfully, it may not, for such reason, be denominated a game of skill, and, if successfully a game of chance, or vice versa.

Now as to the point whether the act contains but one subject and whether it is sufficiently, clearly expressed in the title. Of necessity, subjects of legislation must be expressed in the title with brevity, and it is not intended that the title shall be an index to the act or proposed bill. Here the general subject of the act as expressed in the title relates to horse racing and the creation of a state racing commission. Thereunder it seems reasonably clear that the act could properly contain provisions respecting circumstances and conditions under which horse racing may be permitted and the manner in which it may or shall be conducted or regulated. That, no doubt, may be, or at least ought to be, readily conceded. That such matters are germane to the expressed general subject may not well be doubted. But the respondents assert that the portion of the act permitting betting by or under the pari-mutual system of betting "on the results of said races" bears no relation to such matters, nor to the general subject, and in effect is a distinct, separate, unrelated, and discordant subject. The contention, though plausible, is not, as I think, sound. Suppose section 6 of the act,

the proviso of which is claimed to be a distinct and related subject, contained merely the portion "it shall be unlawful to make or place any wager on the result of any race held under the provisions of this act." Could it successfully be contended that such a provision would not be germane to the expressed general subject, but was a distinct, separate, unrelated, and discordant subject? The inquiry, as it seems to me, answers itself in the negative. That is to say, the act, the title of which expressed a general subject relating to horse racing, could thereunder properly contain provisions respecting the circumstances and conditions under which such races were to be authorized or permitted, the manner in which they were to be conducted or regulated, and in connection therewith could provide that there should be no betting or wagering of any kind on the result of such races. Undoubtedly such legislation would directly relate to, and be germane to, the general subject of horse racing. If it thus be germane to forbid betting and wagering on the result of such races, it seems to me it also would be germane to permit betting or wagering on such results, or to restrict it and provide the kind of system of betting which was to be permitted on such results. Forbidding betting or wagering, or permitting it by or under the pari-mutual system, is not by the act declared to be general, but is expressly restricted to and declared with respect to "the results of said races," horse races, or racing, the expressed general subject in the title—nothing else. I thus think the claimed objectionable portion of the act is germane to the expressed general subject in the title, and by direct and explicit language is tied and restricted to it, betting on horse racing and nothing else, and then only by means of the pari-mutual system.

The respondents, however, assert: How, by merely reading the title of the act and not the body of it, would any one know that the proposed bill contemplated permitting betting or wagering by the pari-mutual system on the result of horse racing? As well say how, by merely reading the title and not the body of the bill, would any one know

whether betting or wagering on such results was to be absolutely forbidden, or permitted, or restricted, or whether licenses were to be granted, or the circumstances or conditions under which they were to be granted, or fees exacted, or what the circumstances or conditions were under which the races were to be permitted, or the manner in which they were to be conducted or regulated? The answer is that titles are not intended nor required to be indices to proposed bills. Assuming that the maxim, as sometimes though perhaps erroneously expressed, that every one is presumed to know the law applies to the Legislature, we may further assume that its members knew that there was no constitutional provision or any statute of the state forbidding wagering or betting on horse racing, and, if they assumed that the proposed bill was silent on the question of betting or wagering on the results and if the bill had so been silent, they were bound to know that it was not unlawful to so bet and wager. And under a title such as here in a proposed bill relating to horse racing, such members were also required to know that the bill could and might include innumerable minor subjects and divers matters germane to the title, and it is not unreasonable to presume or conclude that such members should or ought to have known—at least could have known—that among such minor subjects or matters might be one relating to betting or wagering on the result of the races, either absolutely forbidding such betting, or permitting or restricting or regulating it. In other words, one reading the title was bound to know that the bill proposed some sort of legislation on the subject of horse racing, and might conclude that he was not opposed to such legislation if it forbade betting or wagering on the result of such races, while others reading the title might be in favor of the bill, though it should permit betting on such results or regulated or restricted betting thereon.

I do not say any one on reading the title was required to know that the proposed bill might or could properly contain something in relation to betting on the result of such

races because betting or wagering is a necssary or even usual incident to horse racing, but because the provision in the bill relating to betting was germane to, and consistent and in harmony with, the title of the bill. A provision in a bill to be germane to the subject expressed in the title is not required to be a necessary or even a usual or a customary incident to the subject so expressed in the title. It is enough if it is directly or indirectly related to, and bears a natural connection with, such general subject; and such connection or relationship need not even be logical, but must be harmonious, and not discordant with the expressed subject. The authorities pretty well agree that to constitute duplicity of subject an act must embrace two or more dissimilar and discordant subjects, which by no fair intendment can be considered as having any legitimate connection with or relation to each other, and that any number of provisions may be contained in an act, however diverse they may be, so long as they are not inconsistent with or foreign to the general subject or object, but have a natural relation and connection, directly or indirectly, to the expressed subject. And the fact that many things of a diverse nature are authorized or required to be done is unimportant, provided the doing of them may fairly be regarded as in furtherance of the general subject of the enactment. 25 R. C. L. 842. I do not see wherein a provision forbidding or permitting or restricting or regulating betting on the result of horse racing is inconsistent with, or foreign to, the subject of horse racing, or may not fairly be regarded as in furtherance of such general subject. It further is quite well established that it primarily is for the Legislature to determine the title that shall be prefixed to an act, and where, in the exercise of its discretion, it has chosen a particular title, courts may not hold the title insufficient because a better title might have been provided; and it also is primarily for the Legislature to determine whether the title of an act shall be broad and general, as it here is, or narrow and restricted, and the broader and more general the title, the greater the number of particulars or of

subordinate subjects which may be embraced within it. 25 R. C. L. 849-853. I therefore fully concur with Mr. Justice THURMAN on both propositions.

FRICK, J.

I concur in the first proposition decided. I am unable to concur in the conclusion, however, that the title of the act is not defective. I agree with the majority that in determining the sufficiency of a title courts should be very liberal. In this case, however, the title in my judgment gives no intimation whatever respecting betting on horse races, and hence I am of the opinion that the title is insufficient.